**BARNETT v. EQUITABLE TRUST CO. OF NEW YORK et al.**

District Court, S. D. New York. August 9, 1927.

1. **Indians ⬅➡27(6)—Evidence held to show that Indian donor had no comprehension of purported gift to charity, and gift was void.**

Evidence *held* to show that Indian, who gave $550,000 to wife and $550,000 to charity, had no real comprehension and understanding of what he was induced to do, and was thus without that clear and unmistakable intention to part with his property which is an essential requisite of gift inter vivos, and alleged gift was void and of no effect.

2. **Indians ⬅➡23—Secretary of Interior's approval did not make valid gift by Indian which he was incapable of making because of mental incompetency.**

Approval of Secretary of Interior could not give validity to gift or donation by Indian which apparent donor did not make and which by reason of mental incompetency he was incapable of making, since there was nothing upon which his approval could operate, and his acts were a nullity.

3. **Indians ⬅➡23—Defendants, holding funds of Indian removed from custody of Secretary of Interior under invalid instrument, held same for benefit of rightful owner.**

Where defendants held funds of Indian removed from custody of Secretary of Interior under invalid instrument purporting to make gifts, and defendants were put on notice of Indian's incompetency, and gifts were without consideration, defendants could take no property or beneficial interest therein, and held same, together with interest, for benefit of rightful owner.

4. **Indians ⬅➡23—Defendants receiving funds of Indian under invalid instrument must account for property and turn same over to Secretary of Interior.**

Defendants, holding funds of Indian under invalid instrument purporting to make gifts, must account for their possession and control of property, its income and proceeds that came into their hands, and turn over whole thereunder to Secretary of Interior, to be held by him as property of Indian.

5. **Insane persons ⬅➡94(2)—That appointment of guardian of Indian as mental incompetent had been set aside did not prevent plaintiff as prochein ami from maintaining suit to have gift declared void.**

That appointment of guardian of Indian as mental incompetent by state court had been set aside, but without an adjudication that he was then or was at time of appointment competent, such fact did not impair right of plaintiff as prochein ami of Indian to maintain suit to have alleged gift by Indian declared void because he was incapable by reason of mental incompetency to make such gifts.

Suit by Jackson Barnett, a mental incompetent, by Elmer S. Bailey, his prochein ami, against the Equitable Trust Company of New York and another. Decree in accordance with opinion.

Patterson, Eagle, Greenough & Day, of New York City (Carroll G. Walter, of New York City, and Rayburn L. Foster, Cochran & Ellison and McCrory & Monk, all of Okmulgee, Okl., of counsel), for plaintiff.

Murray, Aldrich & Roberts, of New York City (A. M. Stackhouse, of New York City, of counsel), for respondent Equitable Trust Co. of New York.

Charles S. Fettretch, of New York City (Charles B. Rogers, of Tulsa. Okl., Phillip B. Campbell, of Washington, D. C., and L. O. Lytle, of Sapulpa, Okl., of counsel), for respondent American Baptist Home Mission Soc.

Emory R. Buckner, U. S. Atty., of New York City (Thomas W. Crawford, Alvin McK. Sylvester, of New York City, Charles B. Selby, of Oklahoma City, Okl., and Nat. M. Lacey, of Macon, Mo., of counsel), for intervener.

KNOX, District Judge. For the purposes of this case, it may be assumed that the Secretary of the Interior had power and authority to remove the restrictions which the Congress of the United States has placed upon the property of Jackson Barnett, as a full-blood Indian of the Creek tribe, and to approve such gifts and donations of his property as he in fact made. But such approval, however honest and disinterested it may have been, cannot give validity to a gift or donation which the apparent donor did not make, and which, by reason of mental incompetency, he was incapable of making. Jennings v. Wood (C. C. A.) 192 F. 507; Kendall v. Ewert, 259 U. S. 139, 42 S. Ct. 444, 66 L. Ed. 862.

The record now before the court is of great volume, and it would be a laborious task to summarize all the details of the amazing set of facts that seem to me to compel a conclusion that the instruments under attack should be set aside. By reason of this, my recital of the matters by which I am convinced of Barnett's mental incompetency will be as brief as they can understandingly be stated.

Here is an illiterate Indian, now in the neighborhood of 77 or 78 years of age, who, until he became wealthy, was allowed to shift for himself, and to eke out an existence as best he could. This he did, in a more or less haphazard way, until oil was found upon his allotment of land in Oklahoma. From that time until the present, he has been the shuttledore in a game of battlecock, in which the stakes were high. Solicited and importuned for donations, to which he readily affixed his thumb print for most any one who asked it; kidnapped and married by an adventuress; harassed and annoyed by her attorneys and their allies, who enlisted the support of officials of the government, and who were probably convinced of the justification of their subsequent action—he was finally induced to assent to part with Liberty bonds in the vast sum of $1,100,000. To the credit of the persons engaged in the transaction, it must be said that, under the terms of the gifts thus made, and the trust agreements executed, provision was made for a substantial and sufficient life income to Barnett. But, even so, and admitting that the object of the trust created for Bacone University is a worthy one, and that Mrs. Barnett, so far as is known, has been a good wife to the Indian, the provisions for his support, which are contained in the several instruments of gift, and in the trusts, will not suffice to lend countenance to the ravishment of property rights that here occurred, nor warrant officials of the government in substituting their judgment for that which Barnett was unable to exercise.

The witness Mason, who testified to a conversation had with McGugin, the attorney for Mrs. Barnett, on an occasion in 1921, when he met him, Jackson Barnett, and his wife in an automobile, has been twice convicted for unlawful sales of whisky, and is not friendly to McGugin. His evidence must, in consequence, be considered with these circumstances in mind. Nevertheless, a part of what he told was corroborated by subsequent events, and that was this:

" 'I see,' said Mason, 'you are giving the old man a little air.' 'Yes,' replied McGugin, 'we are airing him out in the car; we are going to air him out of some money.' "

The prophecy came true in the consummation of the transactions now before the court. The extent of the "airing" was that Mrs. Barnett received Liberty bonds in the amount of $550,000, with a part of which she created a trust for Barnett, and turned over to McGugin, as his portion of the distribution, bonds worth $125,000 or perhaps a larger sum. At the same time, and in an effort to make this transaction palatable, a deserving charity was remembered to the extent of $550,000. It is to this gift that the present suit relates.

In considering Barnett's mentality, it is pertinent to give some attention to his proclivity in making donations. In the files of the Department of the Interior, there is an undated letter, thumb-marked by him, in which he donates $1,000,000 for a hospital in or near Henryetta, Okl., $150,000 to be applied to the acquisition of land, and the erection of buildings, the balance to be utilized for an endowment of the institution. Under date of February 11, 1920, Barnett authorized the following gifts to be made out of his restricted funds:

| | |
|---|---|
| Indiana Orphan Home, at Bacone... | $ 50,000 |
| Orphans' Home, near Oklahoma City | 50,000 |
| M. E. Church, South Henryetta...... | 25,000 |
| Christian Church, Henryetta........ | 25,000 |
| Catholic Church, Henryetta......... | 25,000 |
| Nazarene Church, Henryetta........ | 25,000 |
| First Presbyterian Church, Henryetta | 25,000 |
| Episcopal Church, Henryetta........ | 25,000 |
| Silver Springs Indian Church....... | 10,000 |
| Indian Church, near Holdenville..... | 2,500 |
| To the Baptist Church denomination for the work designated in the donation itself ..................... | 200,000 |
| | $462,000 |

Jackson's thumb mark to these proposed gifts, together with one of $1,000,000 for the hospital, were obtained by a man named Casey, at the suggestion of two others named

Cameron and Burroughs, respectively. Casey accomplished his purpose as a result of having frequently gratified Barnett's taste for egg malted milk, and by telling him that his contribution was wanted to build a hospital. The paper was not read over to the Indian, and Casey justifies himself for not having done so by saying that Barnett could not have understood it. Had these gifts been consummated, Casey, Burroughs, and Cameron were to have received $105,000. In this connection, it is only just to say that Cato Sells, who first suggested that Barnett donate $1,000,000 for the purpose of building a hospital, was not to share in the commissions which Casey testifies were to be paid. Mr. Sells was sincere in his desire that a hospital for Indians be erected, and believed himself to be warranted in having Barnett furnish the funds for doing so. The project, however, did not materialize. One reason was that within a week or two the present Mrs. Barnett, then Mrs. Lowe, appeared on the scene, and, after several vicissitudes, succeeded in carrying Barnett to Kansas, where they were married. To make assurance doubly sure, that they were legally wedlocked, she then took him to Missouri, where a second marriage ceremony was had. A few days after the first ceremony, Barnett thumb-marked a letter in which he rescinded the foregoing authorized gifts. He was then under the dominance of his wife and her attorney, McGugin. But some time afterwards, on December 18, 1920, Casey succeeded in getting Barnett into Cameron's office in Henryetta, and had no difficulty whatever in having the Indian repudiate his rescission of the gifts proposed in the original Casey document, and, by a new authorization, reinstate the same as an expression of his wishes and desires. The instrument, last executed, was sent by Cameron to the then Commissioner of Indian Affairs, but that official, although deeply interested in the hospital project, failed to approve the gifts, and they were not made.

Thus matters remained for a period of six months. Meanwhile the administration of the national government changed, and there was a new Commissioner of Indian Affairs and a new Secretary of the Interior, and in July of 1921 overtures for withdrawals of Barnett's money were made to them. Cameron, in company with a delegation of Baptist ministers, and in possession of a letter of introduction from a man named Motter, a special assistant to the recently installed Attorney General of the United States, called on Indian Commissioner Burke, seeking his approval of the donation of $200,000 theretofore attempted to be made by Barnett. The solicitors for funds were requested to initiate the request through the office of Victor M. Locke, Jr., who was then Superintendent of the Five Civilized Tribes. Burke then wrote to Locke and said, inter alia:

"I take it for granted that one of the first steps would be to have it (the proposed donation) referred to Mr. A. J. Ward, the Creek Tribal Attorney, with a request that he express an opinion as to the legal questions that may be involved."

This course was pursued, and on September 24, 1921, Locke forwarded a memorandum prepared by his law clerk and another prepared by Ward. In the letter of transmittal, Locke called attention to the fact that Barnett had been adjudged an incompetent by one of the courts of Oklahoma, and that he had a guardian. The reports of his law clerk and that of Ward had dealt with the relationship between the Department and the probate courts of Oklahoma, and had recommended, in view of resulting questions of law and policy, that the gift be not approved. In this opinion, Locke concurred. It was near this time that McGugin met the special assistant to the Attorney General, who had introduced Cameron to Burke. Very shortly thereafter a petition was prepared and sent to Burke, in which Barnett's Oklahoma guardian was taken to task for the niggardly and unsatisfactory manner in which he looked after the needs of the Barnett family. It was asked that the Indian and his wife, accompanied by Motter, should be permitted to go to Washington for a conference with the Commissioner, and that the sum of $2,500 be allowed for the purpose. The trip was promptly authorized. Difficulty, however, was experienced in securing the approval of Barnett's guardian and the county judge of Okmulgee county to sign a voucher for the expenses of the trip. The United States Probate Attorney was brought into the situation, and he advised the Commissioner of his belief that Barnett knew nothing of the petition, and that he had no desire to go to Washington, and that, in the attorney's opinion, the whole plan was a scheme of McGugin and Mrs. Barnett to get some of the Indian's money. Nevertheless, the county judge finally approved the voucher for the funds that had been requested, notifying the Commissioner that he had done so in a spirit of desiring to co-operate with the Department, but asking that he be advised of any proposed donations or investments of Barnett's funds that would require action by this court. It was not long before Motter, McGugin, and the Barnetts were in the anteroom

leading to the office of Commissioner Burke. Coincident with their presence, M. L. Mott, former Creek attorney, an old acquaintance of Burke, and favorably disposed towards donations by wealthy Indians to worthy charitable and educational objects, happened to be present. In fact, he testified he had expressed his views on this subject to the Commissioner a day or two previous to the arrival of the party from Oklahoma. It likewise appears to be the fact that Mott suggested to Burke that, if Motter should be interested in the affairs of the Barnetts, an embarrassment, due to Motter's connection with the Department of Justice, might arise. Burke thereafter spoke to the special assistant to the Attorney General about this feature of the case, and he apparently stepped out of the situation.

The Washington conference with the Commissioner seems to have been confined to a general talk about the needs and desires of the Barnetts, with particular reference to the alleged obstacles that were being placed in their way by the unfriendly attitude of the Oklahoma guardian and the court which appointed him. Burke, however, did say that, if Barnett made any disposition of his estate, it was his (Burke's) hope that it would be beneficial to his tribe. On the return trip to the West, McGugin and Mott were on the same train, and they took occasion to discuss the affairs of Barnett. According to Mott, he said to McGugin:

"I don't think you are following the case in the right way; I think you ought to take the position that the probate court has no control whatever over the funds of a full-blood restricted Indian, whether he is competent or incompetent, if it is in the hands of the Secretary of the Interior. * * *"

It seems that there was also some discussion about the possible creation of trusts of Barnett's property.

On September 28, Burke wrote to the superintendent of Five Civilized Tribes with reference to the Barnett case. After expressing his views as to how Indians should be protected from designing persons, and commenting upon the luxuries to which Barnett was entitled as a man of wealth, he went on to say that Locke's suggestion with reference to Barnett's making a disposition of his estate so that the Creek Nation would be the beneficiary for educational purposes was one that would meet with his hearty approval. He also said that Barnett should make ample provision for his wife and any immediate relatives that he might have; and further, that it would be gratifying if he would recognize some local institutions if he were so disposed. Burke went on to state that he would, for the present, withhold his approval of the proposed donation of $200,000 to the Baptist Church fund which was urged by Rev. Cameron. From that time on until well into the following year, there was a series of communications passing back and forth between Washington and the various governmental agencies in Oklahoma. These dealt particularly with the guardianship situation and the fact that considerable feeling had been aroused between the Department and the Oklahoma probate court, which had resulted in wide publicity.

In July of 1922, the disposition of $1,100,000 belonging to Barnett began to take definite form, especially after the solicitor of the Interior Department had rendered an opinion to the Secretary as to the extent of the latter's authority over the restricted funds and property of full-blooded Indians. The opinion was that the Secretary might act independently of both the probate court and the guardian whom it had appointed of the property of Barnett, an incompetent restricted allottee, and that he (the Secretary) was not limited or restricted in the control or disbursement of restricted funds of individual Indians of the Five Civilized Tribes, nor could he be so restricted by the order of any probate court or by its failure or refusal to act in the premises.

Thereupon the Commissioner recommended that the rules, that had long been in force with respect to the restricted property of full-blood Indians, be amended, and wrote to the Secretary in part as follows:

"It has been found that in some cases the payment to the guardians of restricted Indians of money out of the restricted funds of such Indians would not be to the best interest of the Indians. In view, therefore, of the above-mentioned, approved opinion of Solicitor for the Interior Department, I recommend that section 24 of the above-mentioned Department regulations be amended by the addition to said section 24 at the end thereof, of the following paragraph:

"'And provided further that any such individual cases or classes of cases as the Secretary of the Interior may direct the Superintendent for the Five Civilized Tribes shall cause such payments as may be authorized to be made out of the royalties and other individual funds of the restricted Indians, minors, and incompetents, to be paid direct to the Indians entitled thereto or to be otherwise paid

out for their benefit and use as the Secretary of the Interior may authorize in said cases.'"

This proposed amendment was speedily adopted and became a part of the departmental rules and regulations.

In the latter part of November, 1922, McGugin, Ward, and Mott were again in Washington, and McGugin remained there until February of 1923. From time to time, some negotiations were carried on with the Department in respect to a purchase of a farm for the Barnetts near Coffeyville, Kan. Nothing came of this project. But, according to McGugin, in one of his conversations with Burke, the latter said:

"What would be the attitude of you, as attorney for Mrs. Barnett, toward a distribution of a part of this estate to some worthy charity, and taking care of Barnett, rendering him secure?"

In reply, McGugin said that Mrs. Barnett had never been adverse to a part of the estate going to such a charity, but it was her desire that whatever was given for that purpose should be for the benefit of the Indians, and that this was Barnett's desire as well as her own. McGugin went on to say to Burke that it had never been the desire of Mrs. Barnett or himself to try to "hog" the estate unreasonably, and that Mrs. Barnett should not have anything except what was a fair share. Further, he called attention to the fact that Barnett had already made two wills in which he had made liberal provision for Indian charities. McGugin informed the Commissioner that Mrs. Barnett would be opposed to any gifts to take effect during the lifetime of Barnett unless, at the same time, she was made a gift in some reasonable amount. The Commissioner said that the restrictions by which Barnett's property was burdened would probably be released in 1931; and, if the Creek died before that year, there would be endless litigation concerning his estate, and that therefore he would like to see at least a part of his property placed where it would be of lasting benefit to the Indians. He went on to say that, if some plans could be worked out in figures, which would be satisfactory to the Department, and which met with the wishes of Barnett, he was willing and ready for the Department to make some distributions from the estate. At this, McGugin and Ward went into an anteroom and talked over the details of distribution as should be made. Ward, it appears, called attention to the fact that several Indians had made gifts to Bacone College, which was under the jurisdiction of the American Baptist Home Mission Society. McGugin observed that, while he had never talked about such a matter with Jackson and his wife, other than upon the occasion when he drew the Indian's will, he had no doubt that Bacone University would be a desirable agency to receive the money, and to distribute it for the benefit of the Indians. It is probable that at this conference the amounts to be distributed out of Jackson Barnett's funds were first seriously discussed, Ward proposing that the school be given $700,000 and that Mrs. Barnett receive $400,000. This division of the funds did not appeal to McGugin as being a suitable provision for Mrs. Barnett. Nevertheless, then and at later times Ward insisted that the division should be $700,000 to the school, and $400,000 for Mrs. Barnett, giving McGugin to understand that these figures would meet with the approval of the Department, and that it would not approve anything else.

So matters continued, and McGugin had, with reluctance, about reached the conclusion to accede to Ward's position. But, before doing so, he again came into contact with Mott, to whom he related the status of the pending negotiations. Mott made the suggestion that the Department was in mighty poor business in giving the woman any money except such an amount as she would inherit if Barnett died without a will. He proceeded to state that:

"The Department has recognized that woman as the dutiful wife of Jackson Barnett, and there are no circumstances justifying or excusing them from even giving her a penny less than one-half—just what she would inherit if Jackson Barnett died intestate."

The matter had not been placed before the Department in that light, but the following day McGugin hastened to do so. He talked with both Burke and Ward, with the result that they went into conference, and at its conclusion McGugin was advised that the Department would not be adverse to placing its approval upon a distribution of one-half of the Indian's estate for the benefit of Mrs. Barnett and one-half for the benefit of Bacone University, provided such plan met with the sanction of Mr. and Mrs. Barnett, and if the details could otherwise be satisfactorily worked out. McGugin lost little time in wiring to the Barnetts to come to Washington.

In passing, it is to be observed that so far this plan had not been suggested to the man whose funds were thus to be distributed.

McGugin was well satisfied with the successful outcome of his negotiations at the Department; and that night he again saw Mott. So happy was he at what had transpired, that

he voluntarily picked up a piece of paper on which he inscribed the following:

"Whereas there is under consideration in the Department of the Interior, the possibility of my husband giving me $550,000, and such gift being approved by the Department of the Interior, as and when that gift is consummated, if consummated, I agree to give to M. L. Mott, $15,000."

He signed it Anna Laura Barnett, by Harold McGugin. The paper was given Mott, and when Mrs. Barnett received her bonds, and had transferred a part of them to McGugin, in payment of his fee, he discharged the obligation of $15,000 he had given to Mott.

In compliance with the request contained in McGugin's telegram, Barnett and his wife, accompanied by a man named Keith, went to Washington, and on December 15, 1922, Jackson Barnett placed his thumb mark on the authorization that resulted in the instrument that plaintiff seeks by this suit to set aside. It is unnecessary, I think, to cite all the details that led to the final execution of the formal instrument; but for a moment let some inquiry be made as to the extent of Barnett's knowledge of what was going on.

He received no information from either Mott or McGugin. There is no evidence that Burke gave him an explanation of what was in prospect, or of what the result would be. If Mrs. Barnett took up the matter with her husband, the record is barren of proof of the fact, for she did not choose to testify. The work of informing Barnett seems to have been left to Ward. He said he had three or four conversations of fifteen to thirty minutes each with Barnett about the proposed gifts. The talks were had in English, and the most definite statement of Barnett's understanding of the matter that the witness was able to give was that when the instrument was about to be executed he asked Barnett:

" 'Now, Jack, I would like to know what your understanding of this is,' and he says, 'My wife he get half, and the Bacone School get half.' 'Well,' continued Ward, 'Is that all?' 'Well,' said Barnett, 'I get money as long as I live.' "

Previous discussions of the subject were, to use Ward's words, "monosyllabic." In the manner described, a king's ransom was transferred from its rightful owner to the donees under the documents that now engage the attention of the court.

In addition to the revelation of Barnett's mental capacity as revealed by what has already been said, the record contains a considerable quantity of testimony given by various witnesses who have known the Indian for a number of years, and who have formed opinions as to his intelligence and mental competence as a result of their contacts with him. The evidence given by these witnesses is in conflict; those of the plaintiff declare Barnett's incompetency, and those of the defendants believe him to have been fully capable of understanding the effect and purport of the instrument to which he affixed his thumb mark.

At the trial, none of the litigants saw fit to call Barnett as a witness. Being desirous of forming some judgment of his mental capacity from my interrogation of him, I called him to the stand. At the time of doing so, each litigant conceded upon the record that the Indian did not understand the nature of an oath. He was therefore not sworn.

From his answers to the questions put to him, I gained a distinct impression that he is a harmless, kindly, mentally undeveloped man, who was extremely bored at the court proceedings, and had no comprehension of their significance. He was able to impart information as to where he lived, as to the number and type of his automobiles, and that he was possessed of several cow ponies. He knew how long he had been in New York in connection with the trial, gave the name of the hotel at which he was stopping, and expressed some idea of the location of one of the restaurants at which he procured his meals. He was aware, too, of his ownership of a farm of about 70 acres, and that he had another piece of property on which there was an oil well; also that money came to him from the oil well, but he did not know the amount of his income. When asked if he had any idea of a million dollars, he answered, "No." Nor could he tell what might be done with that sum of money. Being interrogated concerning schools in Oklahoma, he replied: "Yes, there are lots of them out there; * * * there is a blind school out there, and some Bacone School."

When asked what he liked about Bacone School, he said he did not know. He could remember having been to the school, which had a lot of buildings, and where there were a good many Indians. He was then asked if he wished to do something for Bacone School, and his answer was: "I do not know. When I die, I ain't dead yet."

At this point, it is well to quote the questions propounded by the court, together with the answers made by the Indian:

"Q. What do you want to do with that school when you die? A. Well, they say they are going to let them have the money.

"Q. That is what who said? A. McGugin.

"Q. To let them have the money when you die? A. Yes.

"Q. And what about the money while you are alive? A. I am going to keep it and eat off it.

"Q. What was that? A. I am going to keep it and eat off it all the time while I live.

"Q. Do you know where that money is now? A. No.

"Q. Did you ever make a gift to this school, sign any papers about the school, giving them the money after you died? A. I do not know.

"Q. Do you remember having signed any papers? A. I do not know.

"Q. Well, would you like to give some money to some school here in New York for children? A. I do not know.

"Q. Well, if there was a good school here in New York to take care of poor children? A. Yes.

"Q. Would you like to help that school? A. I do not know.

"Q. Would you like to do something for some hospital here in New York where they take care of poor children? Would you like to give some of your money when you die to some school or hospital here in New York? A. Nodding affirmatively.

"Q. You would? A. Yes; when I die.

"Q. Do you like children? A. Yes.

"Q. Do you want to do something for Indian children? A. What?

"Q. Do you want to do something for Indian children? A. When I die, that is what they say.

"Q. What was that, when you die they say? A. Yes.

"Q. Would you like to do something for Indian children now, if you did not need all your money? Would you like to give some of your money to help Indian children? A. I do not know."

On further examination, the witness recalled both Commissioner Burke and his predecessor, Commissioner Sells. He could remember that he saw the latter in Muskogee and later in Washington, and that Sells wished him to give money to a hospital. He was asked what Sells said to him about a hospital, and his answer was: "He said I ought to put up a hospital out there, and I told him 'No.'" He said he thought Sells asked for about a million dollars, and that he would have put it up but that there was not so much sickness at that time. He disclaims ever having told Sells that he would build a hospital, and by

a negative nod answered that he did not put his thumb mark on a paper for the erection of a hospital. When asked as to what McGugin said about Bacone School, he said: "Well, nothing. He said when I die I am leaving to the Bacone School children to have the money." Barnett was then asked what he said. The reply was: "I told him I think I will go ahead and come back, and asked him the same thing, and when I died I could not have nobody, I would have to let him take it up when I died."

Asked if he had ever been in court, he said, "No;" but he remembered having talked to a judge in Coffeyville. He said that he had never spoken to any other judge, and at the present examination declared that he did not know that he was talking to a judge. He recalled certain persons who visited him in California some time prior to the trial, and could remember his marriage. When dependent upon his own resources, he had been able to save about $100, and stated that he had owned some horses and a cow and chickens, together with some beef cattle which he sold. He was able to tell what it cost to stay at his hotel in New York, and to give some idea as to the purchase price of his clothes; also, that his house and farm cost about $30,000. He did not know, however, whether it would cost $1,000 to go from New York to his home in Los Angeles. When asked if he knew how much money would go to Bacone School from his gift to that institution, he answered: "Well, I do not know; I have to use that money to eat. I am living yet." When asked if he knew how much money Bacone School would get after his death, he replied: "Well, yes; but they are not getting that while I am living yet." He then said that he did not know what the amount would be. This inquiry was then made: "Well, can you not tell me anything like what it would be?" He answered: "I do not know. About fifty or twenty-five."

When inquiry was made as to whether he knew the difference between $100 and $1,000, he said, "Yes;" and answered that "$1,000 was more than a hundred and that a hundred is not quite a thousand." He could not tell, however, how far short of $1,000 $100 is. He also knew that $100,000 is a larger sum than $1,000. He believed that $7,500 is a greater sum than $100,000, but could not tell whether $500,000 was more than $100,000. As to his talks with McGugin in Washington, the witness declared that he did not say anything, and then added: "I told him that I would not like to have Bacone School. When I died, I would let them have the rest of the

money." When asked if his wife was to re-ceive any money, he said: "No; never fig-ured on her." He said that he did not talk to Ward about Bacone School. Asked as to the amount of money he would like to have to eat with and for his own use over the period of a year, he said he did not know, but finally added, in answer to questions, that $50 would not be enough and did not know if $1,000 would be sufficient.

He remembers having given some money to a Baptist Church in Henryetta, but could not tell the amount. Outside of some details as to his immediate personal desires and wants, he was unable to express any intelli-gent conception of what had been done with his property or of what action he had taken in connection with it.

[1, 2] From all the evidence in the case, I am strongly of the opinion that the gifts which purport to have been made by Barnett cannot be regarded as his acts and deeds, and must be held to be void and of no effect. The alleged donor had no real comprehension and understanding of what he was induced to do, and thus was without that clear and unmis-takable intention to part with his property which is, as I understand the law, an essential requisite of a gift inter vivos. Snavely v. Henderson (C. C. A.) 204 F. 978, and cases cited in 28 C. J. 627. It is impossible for me to think that Barnett had any more apprecia-tion or concern for the welfare of Bacone University than was felt by some one of his ancestors who passed to "the happy hunting grounds" of legend, long before he was born. That he knew the value and extent of his property, or conceived the nature of the pro-visions for himself in the trusts that were created, appeals to me as incredible. While he is not insane and is not an idiot, his intel-ligence is so stunted and undeveloped that he lacked the capacity to know what he was do-ing. In consequence of this, and as stated at the outset, there was nothing upon which the approval of the Secretary could operate, and his acts in the premises were a nullity. What-ever may have been his authority to release restrictions upon Barnett's property, and ad-mitting the honesty of his belief and that of his subordinates, that the arrangements made were for the Indian's benefit, he was without authority, as were Burke, McGugin, Ward, and Mrs. Barnett, to appropriate and give away property to which they had neither ti-tle nor power of disposition.

[3, 4] As the instrument under which Bar-nett's funds were removed from the custody of the Secretary of the Interior was and is invalid, the defendants, both of which were put on notice of the Indian's incompetency, and the gifts having been without considera-tion, can take no property or beneficial in-terest therein, and must be found to hold the same, together with the interest thereon, for the benefit of the rightful owner of the prop-erty. Each of the defendants will be required to account for their possession and control of the property, its income and proceeds that came into their hands, and to turn over the whole thereof to the Secretary of the Interior, to be held by him as property of the said Jackson Barnett, under and pursuant to the acts of Congress relating thereto.

[5] Since this case was tried, the appoint-ment of Elmer S. Bailey as guardian of the estate of Barnett, heretofore made by one of the courts of Oklahoma, has been set aside, but without an adjudication that he is or was competent at the time of the appoint-ment. Such fact does not impair the right of plaintiff, as prochein ami of Barnett, to main-tain this suit. In any event, the United States, as intervener, may have the relief which will be accorded by the decree. The question of the right of the United States to be here as intervener has been previously passed upon, and will not again be considered by this court.

In conclusion, and as bearing upon Bar-nett's competency, it is fitting to observe that, shortly after the gifts with which this opin-ion has dealt, he was, at the instance of his wife, declared to be incompetent by a court of California, and guardians of the person and estate were there appointed. In view, how-ever, of the fact that the property of Barnett in the hands of the present defendants should not have been removed from the custody of the Secretary of the Interior, under the cir-cumstances then presented to him, I think the same should be returned to the custody of that official, and there is no necessity to deal with the question of the relative rights thereto of the Secretary and the guardian of Barnett, who may at any time have been appointed by the courts of either of the states of Okla-homa and California.