## KENDALL, ADMINISTRATOR OF REDEAGLE, ET AL. *v.* EWERT.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 157.   Argued March 13, 1922.—Decided May 15, 1922.

1. A deed made by an Indian to one who took it as agent for another employed at the time as a special assistant to the Attorney General in suits to set aside Indian conveyances, *held* void, under Rev. Stats., § 2078, following *Ewert* v. *Bluejacket, ante,* 129.   P. 141.

2. Upon an appeal from a decree of the Circuit Court of Appeals, dismissing an appeal from the District Court upon the ground that the parties had entered into a valid stipulation for the final dismissal of the suit, this court, finding the stipulation invalid, may dispose of the entire cause as justice may require.   P. 142.

3. The inference of incapacity for business arising from the fact that a man is generally regarded in his community as a common drunkard can only be overcome by clear evidence of his ability on the particular occasion, when a transaction in which he was plainly overreached is in question.   P. 146.

4. *Held,* upon the evidence, that a stipulation to dismiss this suit, and a quit-claim deed, both affecting valuable property rights of an Indian, were executed by him when incompetent, due to his addiction to drink, and should be set aside.   P. 148.

5. An Indian's deed of his restricted allotment which is invalid because of his mental incompetency when he made it is not validated by its subsequent approval by the Assistant Secretary of the Interior, presumably given without knowledge of the Indian's condition when the deed was executed.   P. 148.

6. The equitable doctrine of relation is not applied to sustain an inequitable title.   P. 148.

7. Rents and royalties accrued from a restricted allotment of land made to an Indian are personal property passing to his administrator upon his death for payment of taxes and charges of administration and for distribution under the state law, when no act of Congress controls.   P. 149.

8. A suit begun by an Indian allottee to set aside a conveyance of his allotment and for an accounting of rents and royalties, may be revived after his death and maintained by his administrator in respect of the rents and royalties and the costs and expenses of

the litigation, after the land has been duly conveyed to the defendant by the allottee's heirs. P. 149.

9. Where conveyances were set aside because of the grantor's incompetency, *held* that the grantee must give indemnification for a mortgage by which he had encumbered the title in the interim, if it remained a subsisting lien. P. 150.

264 Fed. 1021, reversed.

APPEAL from a decree of the Circuit Court of Appeals dismissing an appeal from a decree of the District Court which dismissed a bill seeking to hold the appellee as trustee for the original plaintiff, Redeagle, in respect of an Indian allotment of mining land, and of rents and royalties derived from it. The dismissal in the court below was based on a stipulation made by Redeagle with the appellee that the suit should be dismissed with prejudice, which the court below upheld against the contention that Redeagle, being a drunkard, was without capacity to make it.

Mr. *Arthur S. Thompson* for appellants.

Mr. *Paul A. Ewert* pro se. Mr. *Henry C. Lewis* and Mr. *William R. Andrews* were also on the brief.

MR. JUSTICE CLARKE delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Appeals, dismissing an appeal from a decree by the District Court which dismissed the petition, in a suit in which it was prayed that appellee, Paul A. Ewert, should be decreed to hold in trust for George Redeagle the title to 100 acres of restricted and very valuable Indian lands, which Redeagle, a full-blood Quapaw Indian, had, in form, deeded, in 1909, to Franklin M. Smith, who, a year later, conveyed the same to Ewert. It was alleged that Smith in bidding upon the land acted as the agent of Ewert who, it was averred, was legally incapable of purchasing it because he was employed at the time by the Government in Indian affairs.

Ewert is the same person who was appellant and appellee in Nos. 173 and 186, respectively. (the *Bluejacket Case*), this day decided, *ante,* 129, and the validity of the deed in this case is assailed, as was the one involved in those appeals, on the ground that Ewert was not competent to make such a purchase under Rev. Stats., § 2078, which reads:

" No person employed in Indian affairs shall have any interest or concern in any trade with the Indians, except for, and on account of, the United States; any person offending herein, shall be liable to a penalty of five thousand dollars, and shall be removed from his office."

The facts in the two cases are very similar, except that in this case the evidence is clear that, regarding himself as prohibited from making the purchase and desiring to conceal his relation to it, Ewert procured Smith to bid on the land, to take the deed for it in his own name and then, a year later, to deed it to him. The deed to Smith was for the consideration of $1,300 but the quit-claim deed from Smith to Ewert was for the recited consideration of $2,000. Ewert admitted in his answer that he purchased the land through Smith, as his agent, but when pressed for a reason for the difference in the considerations, his reply was evasive and indefinite. The restriction on the land expressed in the patent and required by 28 Stat. 907, did not expire until September 26, 1921.

Here as in the other case Ewert, appointed Special Assistant to the Attorney General in October, 1908, " to assist in the institution and prosecution of suits to set aside deeds to certain allotments in the Quapaw Indian Agency," is found in the following February bidding upon and purchasing this Quapaw Indian land.

In the *Bluejacket Case* we have held that, assuming the sale to have been made in the public manner required by the rules of the department, all required action to have been, in form, properly taken, and the deed therein to.

have been approved by the Secretary of the Interior, nevertheless it was void because Ewert was prohibited by Rev. Stats., § 2078, from then becoming the purchaser of such Indian lands, and the construction therein given to the statute must rule this case and render void the deeds herein relied upon to give him title.

But this case presents several additional features.

After the District Court decided in favor of Ewert and dismissed the petition, he paid $700, on July 5, 1918, to procure from Redeagle, a stipulation to dismiss the action *with* prejudice, and for the same consideration and at the same time took from him a quit-claim deed for the land. Before hearing on appeal, by Redeagle, in the Circuit Court of Appeals, Ewert filed a motion to dismiss the appeal, based on this stipulation to dismiss the case, and the appellant, in turn, moved the court to cancel the stipulation and strike it from the files because, as he averred, it was procured by fraud and without notice to his counsel.

When these motions to dismiss were presented to the Circuit Court of Appeals that court ordered that " this cause be  .  .  .  referred back to the District Court  .  .  .  with directions to investigate the circumstances of the stipulation for dismissal of the suit  .  .  . and to report to this court its findings and evidence whether in fact and law said stipulation is a final settlement of the case.  This cause and the motion to dismiss will stand continued in this court pending the receipt of the report from said District Court."

Both the Circuit Court of Appeals and the District Judge treated this order as one of reference, merely, to the District Judge (not to the District Court), to take testimony and report his findings of fact as to the validity of the stipulation, and pursuant thereto the District Judge took testimony and transmitted the same to the Circuit Court of Appeals with his finding that the stipulation was a final settlement of the issues involved in the case, and

thereafter that court dismissed the appeal, reciting in its decree that its conclusion was based on the finding of the District Judge, and upon the reading and consideration of the evidence on which that finding was based.

While the appeal to this court is thus only from this decree of dismissal by the Circuit Court of Appeals, it is plain that, if given effect, that decree would make an end of the entire controversy and would confirm title in Ewert to restricted Indian lands such as we have held in the *Bluejacket Case* he was not competent to acquire, and it therefore is a final decree the appeal from which brings not only the validity of the stipulation for dismissal but the entire cause here for such disposition as the justice of the case may require. Rev. Stats., § 701. *Ballew* v. *United States,* 160 U. S. 187, 199, 200; *Chappell* v. *United States,* 160 U. S. 499, 509; *Camp* v. *Gress,* 250 U. S. 308, 318; *Cole* v. *Ralph,* 252 U. S. 286, 290.

On the reference by the Circuit Court of Appeals to the District Judge various letters by Ewert to Redeagle were introduced which are of great significance.

The decree dismissing the petition was not entered by the District Court until March 4, 1918, but two months before that, on January 3, 1918, Ewert wrote to his adversary, Redeagle, sending a copy " of the opinion rendered by the court ". (which was really only a short letter by the judge to counsel stating that the case would be dismissed and directing that a decree be drawn) saying that he did so thinking that perhaps his, Redeagle's, counsel might keep him in ignorance of the holding that " you have no case."

On July 1, 1918, Ewert wrote Redeagle: that the decree of the District Court had not been appealed from; that the time for appeal, if not already past, soon would be (although two months remained for appeal); and that he wished him to " thoroughly understand his rights." And then, showing that he had been in treaty for settlement

with him, he adds: if you sign the stipulation for dismissal
" that ends the case forever " and I am paying you this
$700 with the distinct understanding that it does " end the
case forever," and he suggests that in order that it may do
him some good, Redeagle should deposit the money in a
bank.   He adds: " If you cash it and get all the money,
you probably will get drunk and lose it and then you will
come back and say that somebody has been trying to cheat
you.   .  . .   I have instructed my clerk that under no
circumstances should she have any dealings with you when
you are intoxicated.   I just now met you down in the
lobby of this building in an intoxicated condition and you
wanted to come to the office and I told you that I would
have nothing to do with you while you were intoxicated.
I have advised my clerk to the same effect, and if you are
intoxicated when you come into this office I want you to
state it, *if it can not be observed;* if you have been drink-
ing any when you come into the office *I want you to tell
my clerk that fact* and she will have no business relations
with you."

On the next day, July 2, 1918, Ewert again writes Red-
eagle, that he had met him in the corridor on the day
before, that when he, Redeagle, wished to talk settlement
of the case, he told him he would not talk business with
him when he had been drinking.   He tells him that he is
leaving home to be gone six weeks, and that he has left a
check for $700 in his office with proper papers for him to
sign if he will come to the office " sober and in your right
mind."   He again suggested that " instead of having this
check cashed and getting drunk and losing the money " he
should deposit the money in some bank for " in that way
you won't be liable to lose the money."   He concludes the
letter by urging Redeagle to come to his office at an early
day, that he bring with him whomsoever he pleases, if
they are reliable and " sober " persons, that he will not
settle this case with his attorneys and that he must make
settlement soon or the offer would be withdrawn.

Three days later, on July 5th, Redeagle went to Ewert's office with a neighbor and there executed the stipulation for dismissal, and also a quit-claim deed for the land, and received $700. He paid the neighbor $100 for taking him to Ewert's office, put $50 in his pocket, left the balance on deposit in the bank and proceeded to go upon a protracted spree.

The clerk who delivered the check and the two witnesses to the paper say that Redeagle appeared to be sober when he executed them and to fully understand what he was doing; indeed the clerk says, " I should say he was more sober that morning than I had ever seen him."

A number of witnesses were heard by the District Judge. Several said that Redeagle had had some education in his youth, but that he had been drinking heavily for many years and had become so incapable of transacting business that they refused to have business relations with him. Others testified that when sober he was competent to do business.

The District Judge announced that he adopted as the basis of his finding of fact the evidence of the Indian agent who had testified. Among other things, this agent said that while he did not think Redeagle mentally weak " he was a drunkard." " He was like all drunkards, he wasn't fit to do business when drunk." He said when he was sober, he knew what he was doing but he had been drinking a number of years and it was injuring him; that he was improvident but " I don't think just because he was a drunkard he ought to be protected."

The District Court, in stating the effect of the evidence, said: " I am inclined to adopt the evidence of the Indian agent that he was an intelligent Quapaw Indian, but that he was profligate and dissipated and that he finally became a drunkard, and that he was such during the year 1918. Now as to the legal effect of that, I will let you brief that."

9545°—23——10

The neighbor who went with Redeagle to Ewert's office to execute the stipulation testified that Redeagle came to him the day before and offered him $50 to take him in his automobile to Ewert's office, a distance of twenty miles, that he declined, but finally agreed to take him for $100, which was paid him from the $700 received on settlement. On this and much other evidence the District Judge found that Redeagle was sober when he signed the stipulation for dismissal, that he knew its purpose and effect, and should be held bound by its terms, and the Circuit Court of Appeals concurred in this conclusion.

Without further discussion of the evidence, it is sufficient to say that, while the witnesses differ as to whether Redeagle had deteriorated to the point of being incompetent to do business when temporarily sober, they all agree, and the District Judge agrees with them, that long before the stipulation for dismissal was signed, he had come to be generally regarded as a common, an habitual, drunkard, and we think the Circuit Court of Appeals failed to give the weight to this fact which it deserves.

That habitual drunkards are not competent to properly transact business is so widely recognized in the law that in many States statutes provide for placing them under a guardian or committee, with authority to put restraint upon them and to preserve their property, not less for themselves than for those dependent upon them. A typical statute makes "All laws relating to guardians for lunatics, idiots and imbeciles, and their wards . . . applicable to the guardians" for drunkards. (Ohio General Code, § 11011.)

The extent to which one must have fallen below the standard of ordinary business capacity before he will be generally recognized in a community as a common drunkard is so notorious that we do not hesitate to say that evidence of competency entirely clear should be required to sustain a transaction in which such a person has

plainly, as in this case, been overreached by a person deal-
ing with him who is competent and aggressive.   Men so
reduced will sacrifice their property, as they have sacri-
ficed themselves, to the craving for strong drink; and
Ewert's letters show that he knew perfectly well that the
Indian with whom he was dealing had reached that un-
fortunate stage of decay.   They show him refusing to
have business dealings with Redeagle three days before
the paper was signed because he had been drinking, but
that at the same time he was eager to obtain from him a
stipulation to dismiss the case, if only he could secure it
under circumstances such that he could make plausible
proof that he was temporarily sober.   His letters, im-
pressing upon Redeagle that his case was lost, that his
lawyers were untrustworthy, and intimating that they had
deserted him, joined with repeated offers of a sum of
money sufficient to enable him to gratify, as he must have
thought for a long time to come, the craving which had
mastered him, if he would only sign away claims which
he was repeatedly assured were valueless, could not pos-
sibly have been more cunningly devised than they were
to constitute an irresistible temptation to such a demora-
lized inebriate.

But whatever doubt we might otherwise have had as
to the correctness of the conclusion of the Circuit Court
of Appeals is removed by evidence which was not before
that court and which is presented to and urged upon our
attention by Ewert himself in support of a motion to dis-
miss on the ground that the case had been settled after
the appeal was taken.   Redeagle died in November, 1918,
and this evidence, which we may consider (*Dakota
County* v. *Glidden,* 113 U. S. 222; *Elwell* v. *Fosdick,* 134
U. S. 500, 513; *Gulf, Colorado & Santa Fe Ry. Co.* v.
*Dennis,* 224 U. S. 503, 508) consists of three quit-claim
deeds from his children for their interest, in the land in
controversy and in the royalties for minerals mined there-

from. For each of these three deeds Ewert paid $6,000 in November and December, 1921. The difference between the $700 accepted by Redeagle and the $18,000 paid for the same property to his presumably competent heirs is most persuasive evidence of the condition of incapacity of Redeagle at the time the stipulation was obtained from him, even though he may have been temporarily sober when he signed the paper.

Upon a full review of the evidence as it is now before us, we do not hesitate to conclude that Redeagle was not competent to contract as, in form, he did in the stipulation to dismiss and that it must, therefore, be decreed to be void, notwithstanding the fact that at the time Ewert was not in the employ of the Government.

But, it is argued, the quit-claim deed for the land executed at the same time as this stipulation, on July 5, 1918, was approved by the Assistant Secretary of the Interior on January 27, 1922, as appears by the copy filed with the clerk of this court, and that the doctrine of relation makes this deed effective from its date.

Of this it would be enough to say that Redeagle was no more competent to make this deed than he was to make the stipulation which we have just held to be void, but we may add that the doctrine of relation is a legal fiction, resorted to for the purpose of accomplishing justice, " to prevent a just and equitable title from being interrupted by claims which have no foundation in equity." *Lykins* v. *McGrath,* 184 U. S. 169, 171; *Pickering* v. *Lomax,* 145 U. S. 310; *Lomax* v. *Pickering,* 173 U. S. 26; *Peyton* v. *Desmond,* 129 Fed. 1, 11. Obviously such a doctrine cannot be resorted to to give validity to a deed obtained under conditions such as we are considering,—it cannot take root in such a soil. We cannot know what disclosure of the conditions under which it was executed was made to the Department when the deed was approved, but we do not doubt that if a full disclosure had been made approval

would not have been given, and the deed must be decreed to be void.

After Redeagle died in November, 1918, this suit, revived in the names of the administrator of his estate and of his three heirs, was prosecuted to the decree of dismissal in the Circuit Court of Appeals in June, 1920, and the appeal to this court was allowed in August of that year. More than two years later, in 1922, a motion to dismiss the appeal was filed, based on the claimed settlement with the three heirs to which reference has been made in this opinion, and it is now contended that this appeal should be dismissed for the reason that there is no party remaining competent to prosecute it in this court.

It is argued that the land involved continued under restriction until September 26, 1921, that neither it nor the royalties issuing therefrom could be encumbered until that date, and that both passed to the heirs so freed from charges of any kind that there was no property or estate for an administrator to administer and no function for him to perform.

With this we cannot agree.

The petition in the case prayed for recovery of the land and also for an accounting for rents and profits. That Redeagle or his heirs could institute such a suit is not disputed and to maintain it he must employ counsel and create court costs which should be paid. The record shows that large sums in royalties for zinc and lead ores mined from the lands involved had been paid to Ewert, and these when accrued were clearly personal property (*United States* v. *Noble,* 237 U. S. 74, 80), which, on the death of Redeagle, would pass to his administrator for purposes of paying any inheritance or other taxes which might be properly chargeable against it, and for other administration charges and for distribution. There being no congressional legislation providing for the administration of such intestate property, the state law is applicable

and we think the administrator is a competent party to assert the right of the estate, whatever it may be, to rents or royalties derived from the land during Redeagle's lifetime.    If Ewert has succeeded to 'the rights of the heirs he will, of course, receive their distributive shares.

It is alleged in the petition, and not denied, that Ewert encumbered the lands involved with a mortgage, and against this indemnification is prayed for, which should be granted if it continues a subsisting lien.

It results that the decree of the Circuit Court of Appeals must be reversed and the cause remanded to the District Court with directions to enter a decree: canceling the deeds, of Redeagle to Smith of March 10, 1909, of Smith to Ewert, dated April 23, 1910, and of Redeagle to Ewert, dated July 5, 1918; providing for an accounting for rents and profits and royalties, and for indemnification from any subsisting lien of any mortgage by Ewert upon the land; and for further proceedings in conformity with this opinion.

*Reversed and remanded.*