# COUNTY OF YAKIMA ET AL. *v.* CONFEDERATED TRIBES AND BANDS OF THE YAKIMA INDIAN NATION

No. 90–408.   Argued November 5, 1991—Decided January 14, 1992*

---

*Together with No. 90–577, *Confederated Tribes and Bands of the Yakima Indian Nation* v. *County of Yakima et al.*, also on certiorari to the same court.

Scalia, J., delivered the opinion of the Court, in which Rehnquist, C. J., and White, Stevens, O'Connor, Kennedy, Souter, and Thomas, JJ., joined. Blackmun, J., filed an opinion concurring in part and dissenting in part, *post,* p. 270.

*Jeffrey C. Sullivan* argued the cause for petitioners in No. 90–408 and respondents in No. 90–577. With him on the briefs was *John V. Staffan.*

*R. Wayne Bjur* argued the cause for respondent in No. 90–408 and petitioner in No. 90–577. With him on the brief was *Tim Weaver.*

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* in support of respondent in No. 90–408 and petitioner in No. 90–577. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Peter R. Steenland, Jr., Robert L. Klarquist,* and *Edward J. Shawaker.*†

JUSTICE SCALIA delivered the opinion of the Court.

The question presented by these consolidated cases is whether the County of Yakima may impose an ad valorem tax on so-called "fee-patented" land located within the Yakima Indian Reservation, and an excise tax on sales of such land.

I

A

In the late 19th century, the prevailing national policy of segregating lands for the exclusive use and control of the

---

†Briefs of *amici curiae* were filed for the State of Montana et al. by *Marc Racicot,* Attorney General of Montana, *Clay R. Smith,* Solicitor, and by the Attorneys General for their respective States as follows: *Gale A. Norton* of Colorado, *Hubert H. Humphrey III* of Minnesota, *Nicholas Spaeth* of North Dakota, and *Mark Barnett* of South Dakota; for the State of Washington by *Kenneth O. Eikenberry,* Attorney General, *Leland T. Johnson,* Senior Assistant Attorney General, and *Timothy R. Malone,* Special Assistant Attorney General; for La Plata County et al. by *Tom D. Tobin* and *Susan W. Pahlke;* for the Mashantucket Pequot Tribe et al. by *Melody L. McCoy, Yvonne Teresa Knight, Kim Jerome Gottschalk, Jeanette Wolfley, Reid P. Chambers, Jeanne S. Whiteing,* and *Robert S. Thompson III;* for the National Association of Counties et al. by *Richard Ruda* and *David J. Burman;* and for the Washington State Association of Counties by *Barnett Kalikow* and *Robert P. Dick.*

Indian tribes gave way to a policy of allotting those lands to tribe members individually. The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large. See, *e. g., In re Heff,* 197 U. S. 488, 499 (1905). Congress was selective at first, allotting lands under differing approaches on a tribe-by-tribe basis. See F. Cohen, Handbook of Federal Indian Law 129–130 (1982); Gates, Indian Allotments Preceding the Dawes Act, in The Frontier Challenge 141 (J. Clark ed. 1971). These early efforts were marked by failure, however. Because allotted land could be sold soon after it was received, see, *e. g.,* Treaty with Wyandot Nation, Apr. 1, 1850, 9 Stat. 987, 992, many of the early allottees quickly lost their land through transactions that were unwise or even procured by fraud. See Cohen, *supra,* at 130. Even if sales were for fair value, Indian allottees divested of their land were deprived of an opportunity to acquire agricultural and other self-sustaining economic skills, thus compromising Congress' purpose of assimilation.

Congress sought to solve these problems in the Indian General Allotment Act of 1887, also known as the Dawes Act, 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.,* which empowered the President to allot most tribal lands nationwide without the consent of the Indian nations involved. The Dawes Act restricted immediate alienation or encumbrance by providing that each allotted parcel would be held by the United States in trust for a period of 25 years or longer; only then would a fee patent issue to the Indian allottee. 24 Stat. 389; see *United States* v. *Mitchell,* 445 U. S. 535, 543–544 (1980). Section 6 of the Act furthered Congress' goal of assimilation by providing that "each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." 24 Stat. 390.

In *In re Heff, supra,* at 502–503, we held that this latter provision subjected Indian allottees to plenary state jurisdiction immediately upon issuance of a trust patent (and prior to the expiration of the 25-year trust period). Congress promptly altered that disposition in the Burke Act of 1906, 34 Stat. 182, decreeing that state civil and criminal jurisdiction would lie "at the expiration of the trust period . . . when the lands have been conveyed to the Indians by patent in fee." A proviso, however, gave the President authority, when he found an allottee "competent and capable of managing his or her affairs," to "issu[e] . . . a patent in fee simple" prior to the expiration of the relevant trust period. Upon such a premature patenting, the proviso specified (significantly for present purposes) *not* that the patentee would be subject to state civil and criminal jurisdiction but that "all restrictions as to sale, incumbrance, or taxation of said land shall be removed." *Id.,* at 183.

The policy of allotment came to an abrupt end in 1934 with passage of the Indian Reorganization Act. See 48 Stat. 984, 25 U. S. C. § 461 *et seq.* Returning to the principles of tribal self-determination and self-governance which had characterized the pre-Dawes Act era, Congress halted further allotments and extended indefinitely the existing periods of trust applicable to already allotted (but not yet fee-patented) Indian lands. See §§ 461, 462. In addition, the Act provided for restoring unallotted surplus Indian lands to tribal ownership, see § 463, and for acquiring, on behalf of the tribes, lands "within or without existing reservations." § 465. Except by authorizing reacquisition of allotted lands in trust, however, Congress made no attempt to undo the dramatic effects of the allotment years on the ownership of former Indian lands. It neither imposed restraints on the ability of Indian allottees to alienate or encumber their fee-patented lands nor impaired the rights of those non-Indians who had acquired title to over two-thirds of the Indian lands allotted

under the Dawes Act. See W. Washburn, Red Man's Land/
White Man's Law 145 (1971).

## B

The Yakima Indian Reservation, which was established by
treaty in 1855, see Treaty with Yakima Nation, 12 Stat. 951,
covers approximately 1.3 million acres in southeastern Wash-
ington State. Eighty percent of the reservation's land is
held by the United States in trust for the benefit of the Tribe
or its individual members; 20 percent is owned in fee by Indi-
ans and non-Indians as a result of patents distributed during
the allotment era. See *Brendale* v. *Confederated Tribes
and Bands of Yakima Nation*, 492 U. S. 408, 415 (1989) (plu-
rality opinion). Some of this fee land is owned by the Yak-
ima Indian Nation itself.

The reservation is located almost entirely within the con-
fines of petitioner/cross-respondent Yakima County. Pursu-
ant to Washington law, Yakima County imposes an ad valo-
rem levy on taxable real property within its jurisdiction
and an excise tax on sales of such land. Wash. Rev. Code
§§ 84.52.030, 82.45.070 (1989). According to the county, these
taxes have been levied on the Yakima Reservation's fee lands
and collected without incident for some time. In 1987, how-
ever, as Yakima County proceeded to foreclose on properties
throughout the county for which ad valorem and excise taxes
were past due, including a number of reservation parcels in
which the Tribe or its members had an interest, respondent/
cross-petitioner Yakima Nation commenced this action for
declaratory and injunctive relief, contending that federal law
prohibited these taxes on fee-patented lands held by the
Tribe or its members.

On stipulated facts, the District Court awarded summary
judgment to the Tribe and entered an injunction prohibiting
the imposition or collection of the taxes on such lands. On
appeal, the Court of Appeals for the Ninth Circuit agreed
that the excise tax was impermissible, but held that the ad

valorem tax would be impermissible only if it would have a "'demonstrably serious'" impact on the "'political integrity, economic security, or the health and welfare of the tribe,'" and remanded to the District Court for that determination to be made. 903 F. 2d 1207, 1218 (CA9 1990) (emphasis deleted) (quoting *Brendale, supra,* at 431). We granted certiorari. 500 U. S. 903 (1991).

## II

The Court's earliest cases addressing attempts by States to exercise dominion over the reservation lands of Indians proceeded from Chief Justice Marshall's premise that the "several Indian nations [constitute] distinct political communities, having territorial boundaries, within which their authority is exclusive . . . ." *Worcester* v. *Georgia,* 6 Pet. 515, 556–557 (1832). Because Congress, pursuant to its constitutional authority both "[t]o regulate Commerce . . . with the Indian Tribes" and to make treaties, U. S. Const., Art. I, § 8, cl. 3; Art II, § 2, cl. 2, had determined by law and treaty that "all intercourse with them [would] be carried on exclusively by the [Federal Government]," *Worcester* v. *Georgia, supra,* at 557, the Court concluded that within reservations state jurisdiction would generally not lie. The assertion of taxing authority was not excepted from this principle. *E. g., The Kansas Indians,* 5 Wall. 737, 755–757 (1867); *The New York Indians,* 5 Wall. 761, 771–772 (1867).

The "platonic notions of Indian sovereignty" that guided Chief Justice Marshall have, over time, lost their independent sway. See *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 172, and n. 8 (1973); *Organized Village of Kake* v. *Egan,* 369 U. S. 60, 71–73 (1962). Congress abolished treatymaking with the Indian nations in 1871, Rev. Stat. § 2079, as amended, 25 U. S. C. § 71, and has itself subjected the tribes to substantial bodies of state and federal law. This Court's more recent cases have recognized the rights of States, absent a congressional prohibition, to exercise criminal (and, implicitly, civil) jurisdiction over non-Indians lo-

cated on reservation lands. See, *e. g., New York ex rel. Ray* v. *Martin,* 326 U. S. 496 (1946); see also Cohen, Handbook of Federal Indian Law, at 352, and n. 39. We have even observed that state jurisdiction over the relations between reservation Indians and non-Indians may be permitted unless the application of state laws "would interfere with reservation self-government or impair a right granted or reserved by federal law." *Organized Village of Kake, supra,* at 75. In the area of state taxation, however, Chief Justice Marshall's observation that "the power to tax involves the power to destroy," *McCulloch* v. *Maryland,* 4 Wheat. 316, 431 (1819), has counseled a more categorical approach: "[A]bsent cession of jurisdiction or other federal statutes permitting it," we have held, a State is without power to tax reservation lands and reservation Indians. *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148 (1973). And our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has "made its intention to do so unmistakably clear." *Montana* v. *Blackfeet Tribe,* 471 U. S. 759, 765 (1985); see also *California* v. *Cabazon Band of Mission Indians,* 480 U. S. 202, 215, n. 17 (1987).

Yakima County persuaded the Court of Appeals, and urges upon us, that express authority for taxation of fee-patented land is found in §6 of the General Allotment Act, as amended.[1] We have little doubt about the accuracy of that threshold assessment. Our decision in *Goudy* v. *Meath,* 203

---

[1] Section 6 provides in pertinent part:

"At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, . . . then each and every allottee shall have the benefit of *and be subject to* the laws, both civil and criminal, of the State or Territory in which they may reside . . . . *Provided,* That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, *and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed.*" 25 U. S. C. § 349 (emphasis added).

U. S. 146, 149 (1906), without even mentioning the Burke Act proviso, held that state tax laws were "[a]mong the laws to which [Indian allottees] became subject" under § 6 upon the expiration of the Dawes Act trust period. And we agree with the Court of Appeals that by specifically mentioning immunity from land taxation "as one of the restrictions that would be removed upon conveyance in fee," Congress in the Burke Act proviso "manifest[ed] a clear intention to permit the state to tax" such Indian lands. 903 F. 2d, at 1211.

Neither the Yakima Nation nor its principal *amicus*, the United States, vigorously disputes this.[2] Instead, they con= tend that § 6 of that Act—the Burke Act proviso included—

---

[2] The Yakima Nation does, however, make a preliminary objection to the taxes on the ground that the Washington State Constitution permits land taxes to be imposed only on those Indians holding fee patents who have terminated their affiliations with the Tribe—which the Indian plaintiffs in these cases have not done. The provision at issue provides in pertinent part as follows:

"That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, *and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States . . . ; Provided,* That *nothing in this ordinance shall preclude the state from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant,* save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, which exemption shall continue so long and to such an extent as such act of congress may prescribe." Wash. Const., Art. XXVI, Second (emphasis added).

We agree with the Court of Appeals that, under this text, the Indian lands not covered by the quoted proviso are not *exempted from taxation,* but merely committed to "the absolute jurisdiction and control of [Congress]." If Congress has permitted taxation, the provision is not violated.

is a dead letter, at least within the confines of an Indian reservation. The Tribe argues that, by terminating the allotment program and restoring tribal integrity through the Indian Reorganization Act of 1934, Congress impliedly repealed § 6's jurisdictional grant and returned the law to its pre-General Allotment Act foundations. Congress' subsequent actions, according to the Tribe, confirm this implication. In 1948, for instance, Congress defined "Indian country" to include all fee land within the boundaries of an existing reservation, whether or not held by an Indian, and pre-empted state criminal laws within "Indian country" insofar as offenses by and against Indians were concerned. See Act of June 25, 1948, 62 Stat. 757–758, as amended, 18 U. S. C. §§ 1151–1153; *Seymour* v. *Superintendent of Washington State Penitentiary*, 368 U. S. 351 (1962). And in 1953, Congress once again signaled its belief in the dormition of § 6 by enacting Pub. L. 280, which authorized States to assume criminal and civil jurisdiction over Indians within Indian country in certain circumstances. See Act of Aug. 15, 1953, 67 Stat. 588.

Though generally in agreement with the Tribe, the United States takes a slightly different tack. It claims that the General Allotment Act removed only those barriers to state jurisdiction that existed at the time of its enactment, *e. g.,* those associated with tribal sovereignty and the trust status of allotted land. The General Allotment Act did not remove—indeed, the argument goes, *could not* have removed—a jurisdictional bar arising after the Act's passage. For just such an after-arising jurisdictional bar, the United States points to the same statutes on which the Tribe rests its position. In the United States' view, these enactments must be construed to pre-empt the application "of state laws (especially state tax laws) to Indians and their property within a reservation." Brief for United States as *Amicus Curiae* 14.

In support of their convergent arguments, the Yakima Nation and the United States cite this Court's unanimous decision in *Moe* v. *Confederated Salish and Kootenai Tribes*, 425 U. S. 463 (1976), which they contend repudiates the continuing jurisdictional force of the General Allotment Act. In that case, the State of Montana sought to impose its cigarette sales and personal property taxes, as well as vendor-licensing fees, on Indian residents of a reservation located entirely within the State. It relied for jurisdiction upon §6 of the General Allotment Act, but did not limit its claim of taxing authority to the reservation's allottees or even to those activities taking place on allotted reservation fee land. Instead, the State made an "all or nothing" claim to reservation-wide jurisdiction (trust land included), arguing that any scheme of divided jurisdiction would be inequitable. Brief for Appellants in *Moe*, O. T. 1975, No. 74–1656, p. 17. We declined Montana's invitation to ignore the plain language of §6, which "[b]y its terms [did] not reach Indians residing" or conducting business on trust lands. *Moe*, 425 U. S., at 478. The assertion of reservation-wide jurisdiction, we said, could not be sustained. But we went much further: In light of Congress' repudiation in 1934 of the policies behind the General Allotment Act, we concluded that the Act could no longer be read to provide Montana plenary jurisdiction even over those Indians residing on reservation fee lands:

> "The State has referred us to no decisional authority— and we know of none—giving the meaning for which it contends to §6 of the General Allotment Act in the face of the ʾany and complex intervening jurisdictional statutes directed at the reach of state law within reservation lands . . . . Congress by its more modern legislation has evinced a clear intent to eschew any such 'checkerboard' approach within an existing Indian reservation, and our cases have in turn followed Congress' lead in this area." *Id.*, at 479.

Reasoning from *Moe*, the Yakima Nation and the United States argue that if § 6 no longer provides for *plenary* state jurisdiction over the owners of reservation fee lands, then it cannot support the exercise of the narrower jurisdiction asserted by Yakima County here. They concede, as they must, that in *Moe* the Court did not address the Burke Act proviso to § 6, which figures so prominently in Yakima County's analysis. But real property taxes were not at issue in *Moe*, they argue, making the proviso irrelevant. And because a proviso can only operate within the reach of the principal provision it modifies, cf. *United States* v. *Morrow*, 266 U. S. 531, 534–535 (1925), neither the language of § 6 proper nor the proviso can be considered effective after *Moe*.

We think this view rests upon a misunderstanding of *Moe* and a misperception of the structure of the General Allotment Act. As to the former: The Tribe's and the United States' interpretation of our opinion in *Moe* reduces ultimately to the proposition that we held § 6 to have been repealed by implication. That is not supportable, however, since it is a "cardinal rule . . . that repeals by implication are not favored," *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936), and since we made no mention of implied repeal in our opinion. *Moe* was premised, instead, on the implausibility, in light of Congress' postallotment era legislation, of Montana's construction of § 6 that would extend the State's *in personam* jurisdiction beyond the section's literal coverage ("each and every *allottee*") to include *subsequent* Indian owners (through grant or devise) of the allotted parcels. This approach, we said, would create a "checkerboard" pattern in which an Indian's personal law would depend upon his parcel ownership; it would contradict "the many and complex intervening jurisdictional statutes" dealing with States' civil and criminal jurisdiction over reservation Indians; and it would produce almost surreal administrative problems, making the applicable law of civil relations depend not upon the locus of the transaction but upon the character of the

reservation land owned by one or both parties. See *Moe, supra*, at 478–479.

Thus, even as to § 6 personal jurisdiction, *Moe* in no way contradicts *Goudy* v. *Meath*, which involved the personal liability for taxes of an Indian who not merely owned an allotted parcel, but was, as the language of § 6 requires, himself an allottee. See 203 U. S., at 147, 149. But (and now we come to the misperception concerning the *structure* of the General Allotment Act) *Goudy* did not rest exclusively, or even primarily, on the § 6 grant of personal jurisdiction over allottees to sustain the land taxes at issue. Instead, it was the *alienability of the allotted lands*—a consequence produced in these cases not by § 6 of the General Allotment Act, but by § 5[3]—that the Court found of central significance. As the first basis of its decision, before reaching the "further" point of personal jurisdiction under § 6, *id.*, at 149, the *Goudy* Court said that, although it was certainly possible for Congress to "grant the power of voluntary sale, while withholding the land from taxation or forced alienation," such an intent would not be presumed unless it was "clearly manifested." *Ibid.* For "it would seem strange to withdraw [the] protection [of the restriction on alienation] and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it *[sic]* from taxation." *Ibid.* Thus, when § 5 rendered the allotted lands alienable and en-

---

[3] Section 5 of the General Allotment Act provides in part:

"[A]t the expiration of said [trust] period the United States will convey [the allotted lands] by patent to said Indian . . . in fee, discharged of said trust and free of all charge or incumbrance whatsoever . . . . And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void . . . ." 25 U. S. C. § 348.

The negative implication of the last quoted sentence, of course, is that a conveyance of allotted land is permitted once the patent issues.

cumberable, it also rendered them subject to assessment and forced sale for taxes.

The Burke Act proviso, enacted in 1906, made this implication of § 5 explicit, and its nature more clear. As we have explained, the purpose of the Burke Act was to change the outcome of our decision in *In re Heff*, 197 U. S. 488 (1905), so that § 6's general grant of civil and criminal jurisdiction over Indian allottees would not be effective until the 25-year trust period expired and patents were issued in fee. The proviso, however, enabled the Secretary of the Interior to issue fee patents to certain allottees *before* expiration of the trust period. Although such a fee patent would not subject its Indian owner to *plenary* state jurisdiction, fee ownership would free the *land* of "all restrictions as to sale, incumbrance, or taxation." 25 U. S. C. § 349. In other words, the proviso reaffirmed for such "prematurely" patented land what § 5 of the General Allotment Act implied with respect to patented land generally: subjection to state real estate taxes.[4] And when Congress, in 1934, while putting an end to further allotment of reservation land, see 25 U. S. C. § 461, chose *not* to return allotted land to pre-General Allotment Act status, leaving it fully alienable by the allottees, their heirs, and assigns, see *Brendale*, 492 U. S., at 423 (plurality opinion); *Hodel* v. *Irving*, 481 U. S. 704, 708–709 (1987), it chose not to terminate state taxation upon those lands as well.

The Yakima Nation and the United States deplore what they consider the impracticable, *Moe*-condemned "checkerboard" effect produced by Yakima County's assertion of ju-

---

[4] Since the proviso is nothing more than an acknowledgment (and clarification) of the operation of § 5 with respect to *all* fee-patented land, it is inconsequential that the trial record does not reflect "which (if any) of the parcels owned in fee by the Yakima Nation or individual members originally passed into fee status pursuant to the proviso, rather than at the expiration of the trust period . . . ." Brief for United States as *Amicus Curiae* 13, n. 10.

risdiction over reservation fee-patented land. But because the jurisdiction is *in rem* rather than *in personam*, it is assuredly not *Moe*-condemned; and it is not impracticable either. The parcel-by-parcel determinations that the State's tax assessor is required to make on the reservation do not differ significantly from those he must make off the reservation, to take account of immunities or exemptions enjoyed, for example, by federally owned, state-owned, and church-owned lands. We cannot resist observing, moreover, that the Tribe's and the United States' favored disposition also produces a "checkerboard," and one that is *less* readily administered: They would allow state taxation of only those fee lands owned (from time to time) by nonmembers of the Tribe. See Brief for Yakima Nation 16, n. 8; Brief for United States as *Amicus Curiae* 14, n. 12. See also *Brendale, supra,* at 422–425 (plurality opinion) (affirming "checkerboard" with respect to zoning power over reservation fee land).

Turning away from the statutory texts altogether, the Yakima Nation argues that state jurisdiction over reservation fee land is manifestly inconsistent with the policies of Indian self-determination and self-governance that lay behind the Indian Reorganization Act and subsequent congressional enactments. This seems to us a great exaggeration. While the *in personam* jurisdiction over reservation Indians at issue in *Moe* would have been significantly disruptive of tribal self-government, the mere power to assess and collect a tax on certain real estate is not. In any case, these policy objections do not belong in this forum. If the Yakima Nation believes that the objectives of the Indian Reorganization Act are too much obstructed by the clearly retained remnant of an earlier policy, it must make that argument to Congress. Judges "are not at liberty to pick and choose among congressional enactments, and when two [or more] statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to

regard each as effective." *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974).

### III

Yakima County sought to impose two separate taxes with respect to reservation fee lands, an ad valorem tax and an excise tax on sales. We discuss each in turn, in light of the principles set forth above.

### A

Liability for the ad valorem tax flows exclusively from ownership of realty on the annual date of assessment. See *Timber Traders, Inc.* v. *Johnston*, 87 Wash. 2d 42, 47, 548 P. 2d 1080, 1083 (1976). The tax, moreover, creates a burden on the property alone. See Wash. Rev. Code § 84.60.020 (1989) ("The taxes assessed upon real property . . . shall be a lien thereon from and including the first day of January in the year in which they are levied until the same are paid . . ."); *Clizer* v. *Krauss*, 57 Wash. 26, 30–31, 106 P. 145, 146–147 (1910). See also *Timber Traders, Inc., supra; In re Electric City, Inc.*, 43 B. R. 336, 341 (Bkrtcy. Ct. WD Wash. 1984) (dictum). The Court of Appeals held, the Tribe does not dispute, and we agree, that this ad valorem tax constitutes "taxation of . . . land" within the meaning of the General Allotment Act and is therefore prima facie valid.

The Court of Appeals, however, derived from our decision three Terms ago in *Brendale* the conclusion that the Yakima Nation has a "protectible interest" against imposition of the tax on Tribe members upon demonstration of the evils described in that opinion, and remanded to the District Court for further findings in that regard. Neither of the parties supports this aspect of the Ninth Circuit's ruling, believing that the law affords an unconditional answer to permissibility of the tax. We agree.

*Brendale* addressed a challenge to the Yakima Nation's assertion of authority to zone reservation fee land owned by non-Indians. The concept of "protectible interest" to which

JUSTICE WHITE's opinion in the case referred, see 492 U. S., at 431, grew out of a long line of cases exploring the very narrow powers reserved to tribes over the conduct of non-Indians within their reservations.  See *Montana* v. *United States*, 450 U. S. 544, 566 (1981) (citing cases).  Even though a tribe's "inherent sovereign powers . . . do not extend to the activities of nonmembers, . . . [a] tribe may . . . retain inherent power *to exercise civil authority over the conduct of non-Indians on fee lands within its reservation* when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 565–566 (emphasis added).  *Brendale* and its reasoning are not applicable to the present cases, which involve not a proposed extension of a tribe's inherent powers, but an asserted restriction of a State's congressionally conferred powers.  Moreover, as the Court observed recently in *California* v. *Cabazon Band of Mission Indians*, 480 U. S., at 215, n. 17, we have traditionally followed "a *per se* rule" "[i]n the special area of state taxation of Indian tribes and tribal members."  Though the rule has been most often applied to produce categorical prohibition of state taxation when there has been no "cession of jurisdiction or other federal [legislative permission]," *Mescalero Apache Tribe*, 411 U. S., at 148, we think it also applies to produce categorical allowance of state taxation when it has in fact been authorized by Congress.  "Either Congress intended to pre-empt the state taxing authority or it did not.  Balancing of interests is not the appropriate gauge for determining validity since it is that very balancing which we have reserved to Congress." *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 177 (1980) (opinion of REHNQUIST, J.).  If the Ninth Circuit's *Brendale* test were the law, litigation would surely engulf the States' annual assessment and taxation process, with the validity of each levy dependent upon a multiplicity of factors that vary from year to year,

and from parcel to parcel. For reasons of practicality, as well as text, we adhere to our *per se* approach.

## B

We think the excise tax on sales of fee land is another matter, as did the Court of Appeals. While the Burke Act proviso does not purport to describe the entire range of *in rem* jurisdiction States may exercise with respect to fee-patented reservation land, we think it does describe the entire range of *jurisdiction to tax*. And that description is "taxation of . . . land." Yakima County seeks to expand this text by citing our statement in *Squire* v. *Capoeman*, 351 U. S. 1 (1956), to the effect that "[t]he literal language of the [Burke Act] proviso evinces a congressional intent to subject an Indian allotment to *all* taxes" after it has been patented in fee. *Id.*, at 7–8 (emphasis added). This dictum was addressed, however, to the United States' assertion that the General Allotment Act barred only States and localities, and not the Federal Government, from levying taxes on Indian allotments during the trust period. "All taxes," in the sense of federal as well as local, in no way expands the text beyond "taxation *of . . . land.*"

It does not exceed the bounds of permissible construction to interpret "taxation of land" as including taxation of the proceeds from sale of land; and it is even true that such a construction would be fully in accord with *Goudy*'s emphasis upon the consequences of alienability, which underlay the Burke Act proviso. That is surely not, however, the phrase's unambiguous meaning—as is shown by the Washington Supreme Court's own observation that "a tax upon the sale of property is not a tax upon the subject matter of that sale." *Mahler* v. *Tremper*, 40 Wash. 2d 405, 409, 243 P. 2d 627, 629 (1952). It is quite reasonable to say, in other words, that though the object of the *sale* here is land, that does not make land the object of the *tax*, and hence does not

invoke the Burke Act proviso. When we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana* v. *Blackfeet Tribe,* 471 U. S., at 766. See also *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 174.

To render this a "taxation of land" in the narrow sense, it does not suffice that, under Washington law, the excise tax creates "a specific lien upon each piece of real property sold from the time of sale until the tax shall have been paid . . . ." Wash. Rev. Code § 82.45.070 (1989). A lien upon real estate to satisfy a tax does not convert the tax into a tax upon real estate—otherwise all sorts of state taxation of reservation-Indian activities could be validated (even the cigarette sales tax disallowed in *Moe*) by merely making the unpaid tax assessable against the taxpayer's fee-patented real estate. Thus, we cannot even accept the county's narrower contention that the excise tax lien is enforceable against reservation fee property conveyed by an Indian seller to a non-Indian buyer. The excise tax remains a tax upon the Indian's activity of selling the land, and thus is void, whatever means may be devised for its collection. Cf., *e. g., Washington* v. *Confederated Tribes of Colville Reservation, supra,* at 154–159 (Indian proprietors may be compelled to precollect taxes whose incidence *legally* falls on non-Indians); *Moe,* 425 U. S., at 482 (same).

The short of the matter is that the General Allotment Act explicitly authorizes only "taxation of . . . land," not "taxation with respect to land," "taxation of transactions involving land," or "taxation based on the value of land." Because it is eminently reasonable to interpret that language as not including a tax upon the sale of real estate, our cases require us to apply that interpretation for the benefit of the Tribe.

Accordingly, Yakima County's excise tax on sales of land cannot be sustained.

\* \* \*

We hold that the General Allotment Act permits Yakima County to impose an ad valorem tax on reservation land patented in fee pursuant to the Act, but does not allow the county to enforce its excise tax on sales of such land. The Yakima Nation contends it is not clear whether the parcels at issue in these cases were patented under the General Allotment Act, rather than under some other statutes in force prior to the Indian Reorganization Act. *E. g.*, 25 U. S. C. §§ 320, 379, 404, 405. We leave for resolution on remand that factual point, and the prior legal question whether it makes any difference.

The judgment is affirmed, and the cause is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and dissenting in part.

I have wandered the maze of Indian statutes and case law tracing back 100 years. Unlike the Court, however, I am unable to find an "unmistakably clear" intent of Congress to allow the States to tax Indian-owned fee-patented lands. Accordingly, while I concur with the majority's conclusion that Yakima County may not impose excise taxes, I dissent from its conclusion that the county may impose ad valorem taxes on Indian-owned fee-patented lands.

The Court correctly sets forth the " 'unmistakably clear' " intent standard to be applied. *Ante*, at 258. But then, in my view, it seriously misapplies it, over the well-taken objections of the Yakima Nation and against the sound guidance of the United States as *amicus curiae*. At bottom, I believe the Court misapprehends the nature of federal pre-emption analysis and, as a result, dramatically devalues longstanding

federal policies intended to preserve the integrity of our Nation's Indian tribes. As I see it, the Court errs in three ways in arriving at its finding of "unmistakably clear" intent to allow taxation of Indian-owned fee-patented lands. First, it divines "unmistakably clear" intent from a proviso, which by its very terms applies only to land patented prematurely (and not to all patented land) and which is now orphaned, its antecedent principal clause no longer having any force of law. Second, acting on its own intuition that it would be "strange" for land to be alienable and encumberable yet not taxable, the Court *infers* "unmistakably clear" intent of Congress from an otherwise irrelevant statutory section that itself makes no mention of taxation of fee lands. Finally, misapprehending the nature of federal pre-emption of state laws taxing the Indians, the Court mistakenly assumes that it cannot give any effect to the many complex intervening statutes reflecting a complete turnabout in federal Indian policy—now aimed at preserving tribal integrity and the Indian land base—since enactment at the turn of the century of the statutory provisions upon which the Court relies. These current and now longstanding federal policies weigh decisively against the Court's finding that Congress has intended the States to tax—and, as in these cases, to foreclose upon—Indian-held lands.

1. The majority concedes that the principal clause of §6 of the Dawes Act, which subjected allottees to the plenary civil and criminal jurisdiction of the States, can "no longer be read to provide . . . plenary jurisdiction even as to those Indians residing on reservation fee lands." *Ante*, at 261. See also *DeCoteau* v. *District County Court*, 420 U. S. 425, 427, n. 2 (1975) (recognizing that statutory definition of "Indian country," which includes all reservation land "notwithstanding the issuance of any patent," 18 U. S. C. §1151, demarcates general boundary of civil jurisdiction of States); *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 177–178, and n. 17 (1973) (discussing more recent congressional enact-

ments, *i. e.*, Pub. L. 280 and the Indian Civil Rights Act of 1968, giving States civil and criminal jurisdiction over reservations but only upon consent of the affected tribe).

Rather than rely on the principal clause of §6, the Court turns to a proviso added by the Burke Act, enacted in 1906.[1] *Ante*, at 264. It acknowledges that the proviso was not even mentioned in *Goudy* v. *Meath*, 203 U. S. 146 (1906),[2] a case upon which the majority relies. *Ante*, at 258–259. As an initial matter, the proviso's attachment to an obsolete principal clause, if anything, must diminish its force as a measure of congressional intent. Moreover, by its terms, the proviso does not remove "restrictions as to . . . taxation" from *all* allotted land. It removes restrictions solely from allotted land that happened to be patented in fee "prematurely," *i. e.*, prior to the expiration of the 25-year trust period. To be sure, the proviso could be read to suggest that Congress *possibly* intended taxation of allotted lands other than those lands patented prematurely.[3] But a possibility, or even a likelihood, does not meet this Court's demanding standard of "unmistakably clear" intent.

---

[1] The proviso states in pertinent part:

"[T]he Secretary of the Interior may, in his discretion . . . whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed . . . ." 25 U. S. C. §349.

[2] *Goudy* relied upon the principal clause of §6. Even if this principal clause had any continuing vitality, whether *Goudy* would still be good law is questionable in light of the Court's more recent decision in *Bryan* v. *Itasca County*, 426 U. S. 373 (1976), where it declined to find a clear intent of Congress to allow a State to tax Indians on the basis of a statute, §4(a) of Pub. L. 280, that on its face conferred upon the State general civil jurisdictional powers over Indian country.

[3] This reading, which would imply the taxability of all fee-patented lands *regardless of whether the owner was an original allottee,* is in some tension with what the majority points out to be the "literal coverage ('each and every *allottee*')" of the principal general-jurisdiction-conferring clause. *Ante*, at 262.

2. And so the Court turns to §5 of the Dawes Act for support. The majority claims that "the proviso reaffirmed for such 'prematurely' patented land what §5 of the [Dawes Act] *implied* with respect to patented land generally: subjection to state real estate taxes." *Ante,* at 264 (emphasis added). Because §5 renders fee-patented lands alienable and encumberable, the majority suggests that " 'it would seem strange to withdraw [the] protection [of the restriction on alienation] and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it *[sic]* from taxation.' " *Ante,* at 263 (quoting *Goudy* v. *Meath,* 203 U. S., at 149).

The majority concedes that §5 only "implied" this conclusion. *Ante,* at 263. In my view, a "mere implication" falls far short of the "unmistakably clear" intent standard. Cf. *EEOC* v. *Arabian American Oil Co.,* 499 U. S. 244, 260 (1991) (SCALIA, J., concurring in part and concurring in judgment) ("Given the presumption against extraterritoriality . . . and the requirement that the intent to overcome it be 'clearly expressed,' it is in my view not reasonable to give effect to mere implications from the statutory language as the EEOC has done").

Nor can what this Court finds "strange" substitute for the "unmistakably clear" intent of Congress. To impute to Congress an intent to tax Indian land because the Court thinks it "strange" not to do so overlooks the countervailing presumption that "Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation." *Williams* v. *Lee,* 358 U. S. 217, 220 (1959). I need not pass upon the wisdom of the majority's fiscal theory that if land is alienable and encumberable, it must be taxable. I pause only to comment that Congress has made its own agreement with this particular economic theory less than "unmistakably clear." Cf. *Lochner* v. *New York,* 198 U. S. 45, 75 (1905) (Holmes, J., dissenting) ("This case is decided upon an economic theory which a large part of the country does not entertain").

3. In any event, if "strangeness" is the benchmark of what Congress unmistakably intends, I find it stranger still to presume that Congress intends States to tax—and, as in these cases, foreclose upon—Indian-owned reservation lands. This presumption does not account for Congress' "abrupt" termination of the assimilationist policies of the Dawes Act in favor of the Indian Reorganization Act's now well-established "principles of tribal self-determination and self-governance." See *ante*, at 255.

The Court announces that the Yakima's "policy objections do not belong in this forum." *Ante*, at 265. Yet, not to consider the policies of the Indian Reorganization Act is to forget that "we previously have construed the effect of legislation affecting reservation Indians in light of 'intervening' legislative enactments." *Bryan* v. *Itasca County*, 426 U. S. 373, 386 (1976). See also *Moe* v. *Confederated Salish and Kootenai Tribes*, 425 U. S. 463, 479 (1976) (noting that State's interpretation of § 6 of the Dawes Act cannot survive "the many and complex intervening jurisdictional statutes" subsequently enacted). The majority appears to assume that these intervening enactments need not be given any effect here, because they do not rise to the level of a "repeal" of the Dawes and Burke Acts. *Ante*, at 262. I agree with the majority that implied repeals are not favored. But this is beside the point. A "repeal"—whether express or implied—need not be shown to preclude the States from taxing Indian lands.

As in all state-Indian jurisdiction cases, the relevant inquiry is whether Congress has *pre-empted* state law, not whether it has *repealed* its own law. See, *e. g.*, *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202, 216 (1987); *Bryan* v. *Itasca County*, 426 U. S., at 376, n. 2. Under established principles of pre-emption, and notwithstanding the majority's derisive characterizations, see *ante*, at 264–265, state laws may in fact give way to "mere" federal policies and interests. See *English* v. *General Electric Co.*, 496 U. S. 72, 79 (1990) (state law is pre-empted to the extent that it

" 'stands as an obstacle to the accomplishment and execution of the *full purposes and objectives* of Congress' ") (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)) (emphasis added)).  Thus, in the Indian context, " '[s]tate jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.' "  *California* v. *Cabazon Band of Mission Indians*, 480 U. S., at 216 (quoting *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 334 (1983)).[4]  See also *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143–145 (1980) (recognizing "firm federal policy" of promoting tribal self-sufficiency and economic development and noting that the pre-emption inquiry "call[s] for a particularized inquiry into the nature of the state, federal, and tribal *interests* at stake") (emphasis added).

Accordingly, this Court has made clear that "[t]he inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development."  *Cabazon*, 480 U. S., at 216.  In *Cabazon*, for example, the Court gave weight to recent policy statements by Congress and the President in support of Indian autonomy and self-determination, deeming them to be "particularly significant in this case."  *Id.*, at 216, n. 19; see also *id.*, at 217–218, and nn. 20–21.[5]

---

[4] In *Cabazon*, the Court reiterated that "the federal tradition of Indian immunity from state taxation is very strong and that the state interest in taxation is correspondingly weak."  480 U. S., at 215, n. 17.

[5] I have previously observed:

"Surely, in considering whether Congress intended tribes to enjoy civil jurisdiction, . . . this Court should direct its attention not to the intent of the Congress that passed the Dawes Act, but rather to the intent of the Congress that repudiated the Dawes Act, and established the Indian policies to which we are heir."  *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 464 (1989) (opinion concurring in judgment in part and dissenting in part).

I believe that if the majority were inclined to give federal policy interests any effect, its conclusion as to Congress' "unmistakably clear" intent would doubtless be different today. The nature of federal policy interests emerges clearly from a review of the effects of the Indian land-allotment policies. During the allotment period from 1887 to 1934, Indian landholdings were reduced nationwide, through a combination of sales by allottees to non-Indians and Government sales of "surplus" unallotted lands, from about 138 million acres to 48 million acres.   See F. Cohen, Handbook of Federal Indian Law 138 (1982).   Of the 90 million acres lost, about 27 million acres passed from Indians to non-Indians, as a result of the alienability of the newly allotted land.   *Ibid.*   See also Readjustment of Indian Affairs, Hearings on H. R. 7902 before the *House Committee on Indian Affairs,* 73d Cong., 2d Sess., 17 (Comm. Print 1934) (Memorandum of John Collier, Commissioner of Indian Affairs) (Hearings).

For 12,000 years, the Yakima Indians have lived on their lands in eastern Washington.   See H. Schuster, The Yakima 14 (1990).   Because of the allotment policies, non-Indians today own more than a quarter million acres, more than half the land originally allotted to individual members of the Yakimas.   *Id.,* at 83.   "Allotment and the subsequent sale or lease of Indian lands accomplished what the 'genocide' of epidemics, war, and bootlegged alcohol had not been able to do: a systematic 'ethnocide' brought about by a loss of Indian identity with the loss of land."   H. Schuster, The Yakimas: A Critical Bibliography 70 (1982).

It is little wonder that, as Congress moved toward repudiating the allotment system in 1934, the Commissioner of Indian Affairs informed Congress:

"It is difficult to imagine any other system which with equal effectiveness would pauperize the Indian while impoverishing him, and sicken and kill his soul while pauperizing him, and cast him in so ruined a condition

into the final status of a nonward dependent upon the States and counties." Hearings, at 18.

I am mystified how this Court, sifting through the wreckage of the Dawes Act, finds any "clearly retained remnant," *ante,* at 265, justifying further erosions—through tax foreclosure actions as in this litigation—to the landholdings of the Indian people.[6]

The majority deems any concerns for tribal self-determination to be a "great exaggeration." *Ante,* at 265. I myself, however, am "far from convinced that when a State imposes taxes upon reservation members without their consent, its action can be reconciled with tribal self-determination." *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 179. The majority concludes that, as a practical matter, "mere" property taxes are less disruptive of tribal integrity than cigarette sales taxes and certain personal property taxes (as on automobiles) that were at issue in *Moe. Ante,* at 264–265. I cannot agree that paying a few more pennies for cigarettes or a tax on some personal property is more a threat to tribal integrity and self-determination than foreclosing upon and seizing tribal lands.

---

[6] The Court concludes that Congress' decision in the Indian Reorganization Act not to reimpose restraints on alienation of land already patented suggests that Congress also "chose not to terminate state taxation upon those lands as well." *Ante,* at 264. In 1934, when the process of allotment was halted, 246,569 assignments had been made nationwide, totaling nearly 41 million acres (slightly less than the entire acreage of the State of Washington). Indian Heirship Land Survey, Memorandum of the Chairman to the Senate Committee on Interior and Insular Affairs, 86th Cong., 2d Sess., pt. I, p. 2 (Comm. Print 1960). In my judgment, Congress' choice not to effect a taking of this magnitude does not reflect an intent to continue other policies contributing to the loss of Indian lands. If anything, Congress' intent is to be gauged not by negative implication from what it failed to do, but from provisions in the Act that stop further allotment, that freeze in trust already allotted-but-not-yet-patented land, and that affirmatively authorize repurchases of Indian lands to rebuild the tribal land base. See generally 25 U. S. C. §§ 461–465.

Finally, the majority platitudinously suggests that the Yakima "must make [their policy] argument to Congress." *Ante,* at 265. I am less confident than my colleagues that the 31 Yakima Indian families likely to be rendered landless and homeless by today's decision are well positioned to lobby for change in the vast corridors of Congress.