**Nicholas T. SCOTT, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 92–00011.

United States District Court,
D. Hawaii.

Nov. 19, 1993.

Nicholas T. Scott, pro se.

Daniel Bent, Michael Chun, Asst., U.S. Attys. Office, Honolulu, HI, Thomas Moore, U.S. Dept. of Justice, Washington, DC, for USA and IRS, Director.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAY, Chief Judge.

THIS MATTER came before the Court for trial on October 5, 1993 through October 7, 1993. Having considered the testimony and other evidence presented, the Court enters its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### BACKGROUND

Plaintiff Nicholas T. Scott ("Scott") brought this action to recover an overpayment of federal income taxes for 1984. On November 28, 1989, by filing a tax return for the 1984 taxable year, Scott made his refund claim to the Internal Revenue Service ("IRS"). The IRS refused Scott's refund claim, asserting that the statute of limitations for filing it had expired. Scott contends that equitable tolling principles prevent his refund claim from being time-barred. He specifically argues that from the time his 1984 tax return was due to the time he actually filed that return, he suffered from severe alcoholism, which caused him to be mentally incompetent and incapable of filing a tax return. Thus, the central issues in this case are whether Scott was incompetent from the time his 1984 tax return was due to the time he actually filed that return, and, if so, whether his incompetency tolls the statute of limitations.

As an initial matter, this Court holds that any finding of fact which may be deemed, in whole or in part, more properly a conclusion of law shall be deemed as such, and any conclusion of law which may be deemed, in whole or in part, more properly a finding of fact shall be deemed as such.

### FINDINGS OF FACT

#### A. Scott's Refund Claim

1. This is a federal income tax refund suit involving an overpayment of taxes by Scott for the calendar year 1984.

2. In 1984, after Scott received an inheritance, he invested that money in a partnership known as "Wine Horizons," a business which operated a retail wine store in Danville, California.

3. Prior to that time, around 1980, Scott gave a power of attorney to his father, Gene Scott. Gene Scott demanded the power of attorney when he learned that Scott had failed to file and pay federal income tax for previous years.

4. During 1984, in accordance with the terms of the power of attorney, Gene Scott made federal tax deposits on Scott's behalf. In December 1984 or January 1985, Gene Scott revoked the power of attorney by tearing it up. At the time he tore up the power of attorney, Gene Scott insisted that Scott make his last estimated tax payment for 1984, which was due in January 1985. Scott made the final payment in a timely fashion.

5. Scott paid a total of $30,096.00 to the IRS for application to his 1984 federal income taxes.

6. Scott had no tax liability for 1984.

7. Scott's 1984 tax return was due on April 15, 1985.

8. Scott filed a tax return for the 1984 taxable year on November 29, 1989. Through that tax return, Scott sought a refund of the $30,096.00, plus interest.

9. The IRS denied the claim for refund, maintaining that the statute of limitations for

filing a refund claim had expired. The United States cites the applicable statute of limitations as 28 U.S.C. § 6511.

10. On January 8, 1992, shortly after the IRS denied his claim, Scott filed this action to recover the overpayment of the $30,096.00, plus interest. Scott asserts that his refund claim is not time-barred under equitable tolling principles because, from the time his 1984 tax return was due to the time he actually filed that return, he was mentally incompetent as a result of his alcoholism.

### B. *Scott's Alcoholism*

11. From the early 1980's through at least early November 1989, Scott was a severe alcoholic. Scott presented testimony from several witnesses chronicling his alcoholism. The evidence of Scott's alcoholism is overwhelming. Below are examples of this evidence:

(a) In the early 1980's, Scott began drinking large quantities of alcohol. Scott drank so heavily that he began to suffer from blackouts on a nearly daily basis, particularly in 1986 and 1987. Also because of his heavy drinking, Scott's father held a power of attorney for him from around 1980 to January 1985.

(b) Scott's heavy drinking caused him to be suspended from the California bar for failure to pay his bar dues.

(c) Scott's heavy drinking resulted in several failed relationships with women.

(d) In 1980, Scott was in a car accident because of his drinking.

(e) In 1981, Scott lost a job as an attorney because of his drinking.

(f) From 1982 through 1986, Scott received five citations from the State of California for driving under the influence of alcohol (DUI). The dates of the DUI violations include: (1) October 22, 1982; (2) July 15, 1986; (3) July 18, 1986; (4) August 14, 1987; and (5) January 2, 1988.

(g) From 1984 to July 1987, the entire time Scott operated Wine Horizons, Scott spent most of his time buying wine for the store, engaging in wine tasting sessions with his customers, and drinking wine and vodka. Because wine was not always strong enough for Scott, Scott would fill a glass full of vodka and then add a few drops of wine to make the vodka appear to be wine.

(h) Also during the entire time Scott operated Wine Horizons, Scott paid no attention to bills or operation of the books. These matters were handled by others. Moreover, all partnership documents, sales tax returns, and other documents were prepared by others.

(i) In 1985, Scott's long-time girlfriend was killed in a car accident, causing Scott to become very depressed and to increase his alcohol intake to even greater levels.

(j) In 1985, Scott's heavy drinking caused his partner in Wine Horizons to walk out on him. Even at the time the partnership agreement was entered into in 1984, Scott and his partner added an addendum to the agreement addressing the partner's concern over Scott's potential incapacity due to alcohol abuse.

(k) In January 1987, due to his alcoholic state, Scott failed to pay the rent for his wine store, Wine Horizons. As a result, he entered into a stipulation with his landlord in which Scott agreed to pay the rent owed on a certain time frame, and, if he failed to do so, Scott's landlord was empowered to file an *ex parte* application which would allow the landlord to obtain a writ of execution on the entire inventory of Wine Horizons. This stipulation was filed in the Superior Court of the State of California, County of Contra Costa on February 9, 1987. Judgment was entered on the stipulation on June 3, 1987.

(*l*) In February 1987, Scott's landlord insisted that David Green, an employee of Scott, run the wine shop's operations because, due to Scott's alcohol abuse, the landlord had little confidence in Scott's competence to run it.

(m) Scott failed to pay the rent as specified in the February 1987 stipulation with his landlord, and, on July 2, 1988, Scott received a notice of default. The notice informed Scott that the writ of execution on Wine Horizons' inventory would be executed on July 10, 1987 if Scott did not pay the rent owed.

(n) Scott kept his personal collection of wines, worth about $30,000.00, at Wine Horizons. His personal collection was not part of Wine Horizons' inventory. Even though Scott knew that his personal collection would be seized with Wine Horizons' inventory if he did not remove it from the store, Scott did nothing to protect his personal collection because his alcoholic state made him apathetic and uncaring about anything but his next drink. Scott ignored the pleas of friends urging him to protect his personal collection of wine.

(o) When the writ of execution was executed on July 10, 1987, Scott simply remained in the store, drinking, as the sheriff took away the inventory.

(p) With regards to the August 14, 1987 DUI violation, Scott was sentenced to 30 days in prison and 10 days at DUI school. Any person showing up to the DUI school while intoxicated would be thrown out of the school. Scott was thrown out of the school because he showed up with alcohol on his breath. Scott served the 30 days of prison starting sometime in mid-August 1987 through sometime in mid-September 1987.

(q) After Scott was released from prison in mid-September 1987, he attended the public sale of Wine Horizons' inventory. Scott believed the wine was being sold to his landlord's attorney through a strawman and believed this to be illegal. Nevertheless, Scott's alcoholic state prevented him from objecting to the sale.

(r) Sometime after the public sale of Wine Horizons' inventory, Scott was evicted from the building in which Wine Horizons had operated. When he was evicted, Scott did not even attempt to safeguard or rescue his business records.

(s) For Scott's fourth and fifth DUI violations, Scott was incarcerated from about November 23, 1987 to September 1, 1988. When incarcerated during this period, Scott was a member of an alcoholic rehabilitation program at prison, known as the Deuce Program. As part of this program, Scott was allowed supervised releases from prison, normally for 48 hours every two weeks. On January 2, 1988, the date of Scott's fifth DUI violation, Scott had been released from prison on the order of a California state judge so that he could help his girlfriend move into a new apartment. Despite the fact that Scott obtained an additional DUI while on release, Scott was not removed from the Deuce Program, and, was still allowed releases from prison. During Scott's 48-hour releases from prison, Scott would drink continuously.

(t) As soon as Scott was released from prison in September 1988, Scott immediately became intoxicated.

(u) Several days after his release from prison, Scott's sister urged him to pay his federal income taxes. At her continued insistence, Scott finally obtained an accountant to prepare the income tax returns. Scott obtained the accountant sometime in January 1989, but, because of his alcoholic state, did not get the necessary documents to the accountant until shortly before the 1984 tax return was filed in November 1989.

12. In addition to these examples, the expert testimony in this case, discussed below, supports a finding that Scott suffered from severe alcoholism from the early 1980's through at least early November 1989.

## C. *Scott's Mental Competency*

### 1. *Expert Testimony*

13. Dr. Gerald McKenna, M.D., testified as an expert witness for the United States. Both parties agreed that Dr. McKenna is highly qualified to testify about the subject of the effect of alcohol abuse on a person's mental competency. Dr. McKenna's Curriculum Vitae, expert report and expert testimony support a finding that Dr. McKenna is an expert on this subject. Based on the foregoing, this Court finds that Dr. McKenna is an expert qualified to testify about the effect of alcohol abuse on a person's mental competency.

14. Dr. Patrick Norman, M.D., testified as an expert witness for Scott. Both parties agreed that Dr. Norman is highly qualified to testify about the subject of the effect of alcohol abuse on a person's mental competency. Dr. Norman's Curriculum Vitae, expert

report and expert testimony support a finding that Dr. Norman is an expert on this subject. This Court finds that Dr. Norman is an expert qualified to testify about the effect of alcohol abuse on a person's mental competency.

15. In forming their expert opinions, both Dr. McKenna and Dr. Norman relied on the same evidence that each party presented to the Court during the trial on this matter, including, but not limited to, the facts as described in Part B.

16. Dr. McKenna and Dr. Norman were in agreement about Scott's mental competency, an unusual circumstance in this Court's experience. They testified that:

(a) Alcohol is a drug which can lead to mental incompetence if used in sufficient doses and over a long enough period of time. The degree of mental incompetence is directly related to the dosage of alcohol and the length of time over which high doses of alcohol have been consumed. High doses of alcohol induce blackouts.

(b) Alcoholism is a disease, not a wrongful or reprehensible act.

(c) Scott suffered from severe alcoholism from the early 1980's to at least early November 1989.

(d) Scott was mentally incompetent from, at least, January 1985 through September 1987 and September 1988 through November 1989, and, as a result, did not have the mental capacity to file his tax return during this period.

(e) As to Scott's mental condition while in jail from September 1987 through September 1988, the experts testified to the following:

(i) While both experts were not precisely certain as to whether Scott was mentally incompetent while in jail between September 1987 and September 1988, both of them agreed that there is a residual impact from alcohol abuse which delays the recovery of cognitive abilities. They both further agreed that it is not necessary to have alcohol in your system to experience the residual impact and to remain mentally incompetent.

(ii) Dr. Norman also testified about the dry drunk syndrome where incompetence from alcoholism is retained if the alcoholic is not committed to rehabilitation. Dr. McKenna did not challenge Dr. Norman's testimony regarding the dry drunk syndrome.

17. Based on this expert testimony concerning the residual impact of alcohol abuse and the dry drunk syndrome, and based on the fact that, when Scott was released from the Deuce Program every two weeks, Scott constantly drank during the release, this Court finds that Scott also suffered from severe alcoholism during his term in jail from September 1987 to September 1988, and, as a result, was mentally incompetent to file his tax return during this period.

### 2. United States' Counter–Argument

18. The United States attempted to counter the expert witnesses' testimony that Scott was mentally incompetent. Some of the facts which the United States highlighted to argue Scott was competent to file a 1984 tax return include:

(a) In 1984, Scott executed a partnership agreement to operate Wine Horizons.

(b) In 1985, Scott entered into an agreement dissolving the partnership so that he could operate Wine Horizons on his own.

(c) During the time he operated Wine Horizons, Scott filed state sales tax.

(d) Scott obtained an attorney to represent him on his 1987 and 1988 DUI charges.

(e) Scott opened and closed his retail business everyday.

(f) Scott paid his utilities and rent.

19. As detailed above, Scott explained that most of these matters were initiated and handled by persons other than himself. Additionally, the attorney who represented him on the DUI charges was not retained to do anything regarding Scott's tax affairs.

20. The facts highlighted by the United States to establish that Scott was competent to file his tax return were before Dr. McKenna and Dr. Norman when they formed their opinions about Scott's mental competency.

21. Without the expert testimony in this case, the Court might otherwise find the United States' argument somewhat persuasive. Given that the expert witnesses had the facts highlighted by the United States before them when they formed their opinions and that the experts have been qualified to deliver opinions about Scott's mental competency, this Court finds the expert testimony of Dr. McKenna and Dr. Norman to be more credible than argument and evidence of the United States, and therefore holds that the expert testimony is controlling. Scott's rebutting testimony supports a finding that the expert testimony is controlling.

### 3. *Findings On Scott's Competency*

22. Based on the testimony of both parties' expert witnesses and the facts as described in Part B, the Court finds that:

(a) Scott was mentally incompetent from January 1985 through early November 1989, including the period in which Scott was in and out of jail in 1987 and 1988.

(b) Scott did not have the capacity to file his 1984 tax return during the years of his incompetency, including the period in which Scott was in and out of jail.

### D. *Damages*

23. Scott and the United States have stipulated that Scott made an overpayment of $30,096.00 on his 1984 taxes.

24. Scott and the United States have stipulated that the interest on the $30,096.00 from November 28, 1989 to October 5, 1993 brings the total to $41,327.00.

25. Scott and the United States have stipulated that the interest on the $30,096.00 from April 15, 1985 to October 5, 1993 brings the total to $64,873.00.

26. Scott and the United States have stipulated that the amount awarded by the Court should continue to accrue interest from October 6, 1993.

27. Scott and the United States acknowledge that the Internal Revenue Code provides for interest to the prevailing refund claimant from and after the time he files his refund claim. Nevertheless, Scott argues that the Court should use its equitable powers to award Scott interest from the date his 1984 tax return was due, as the United States has had the use of his money from that date.

### CONCLUSIONS OF LAW

1. Given that this Court has found that Scott was mentally incompetent and could not file his 1984 federal income tax return during the period from January 1985 through early November 1989, the issue becomes whether his incompetency will toll the statute of limitations for tax refund cases.

2. The appropriate limitations period for tax refund cases is set forth in 26 U.S.C. §§ 6511.

3. In *Scott v. United States*, 795 F.Supp. 1028 (D.Haw.1992) (*Scott I*), this Court denied the United States' motion to dismiss Scott's complaint. This Court held that principles of equitable tolling apply to tax refund cases, and that mental incompetency constitutes a ground for equitable tolling. *Id.* at 1035. The United States relies on *Oropallo v. United States*, 994 F.2d 25 (1st Cir.1993), which held that equitable tolling principles do not apply in tax refund cases, to request that this Court reconsider its contrary holding in *Scott I.*

4. In holding that equitable tolling principles do not apply in tax refund cases, *Oropallo* relied on *Lampf, Pleva, Lipkind, Prupis & Petrigrow v. Gilberston*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). In *Lampf*, the United States Supreme Court considered whether to adopt a federal limitations period in private suits under section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), and, if so, whether that period would be subject to equitable tolling. The Supreme Court selected the 1–and–3–year limitations periods contained in the 1934 Act and in the original remedial provisions of the Securities Act of 1933, as typified by section 9(e) of the 1934 Act, 15 U.S.C. § 78i(e). *Lampf*, 501 U.S. at ——, ——, 111 S.Ct. at 2781, 2782 n. 9. Section 78i(e) provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and

within three years after such violation." 15 U.S.C. § 78i(e). Citing *Irwin v. Veterans Administration*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court acknowledged that time limits in law suits are normally subject to equitable tolling. Nevertheless, the Supreme Court found that section 78i(e) was not subject to equitable tolling because equitable tolling is fundamentally inconsistent with the 1–and–3–year structure. *Lampf*, 501 U.S. at ——, 111 S.Ct. at 2782. The *Lampf* Court explained the effect of section 78i(e) as follows: (1) the 1–year period makes tolling unnecessary because that period begins only after the discovery of the facts constituting the violation, and (2) the 3–year period acted as the outside limit for which Congress intended that a plaintiff could bring an action. *Id.* The *Lampf* Court then stated that "[b]ecause the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period." *Id.* Thus, the Supreme Court's principal rationale for not applying equitable tolling in *Lampf* was the cutoff provision of section 78i(e).

5. The *Oropallo* court stated "[w]e think that section 6511(a) and (b)(2)(A) are structured like the 1–and–3–period considered by the Supreme Court in *Lampf*," and therefore refused to apply equitable tolling principles to tax refund cases. *Oropallo*, 994 F.2d at 30. *Oropallo* found section 6511(a) to be analogous to the 1–year period in *Lampf*, stating: "We have assumed that a return can be filed at any time after its due date and still be a return for purposes of filing a claim within that three-year period. Under that interpretation, the limitations period in section 6511(a) is totally illusory." *Id.* *Oropallo* then found section 6511(b)(2)(A)'s limit on the amount of money a taxpayer can recover to be analogous to section 78i(e)'s limit on the institution of a cause of action, stating: "By imposing an 'outside limit' or 'cut-off' on the amount of taxes which can be recovered, section 6511(b)(2)(A) operates like the three-year portion of the limitations period in *Lampf*, and thus is a 'period of repose inconsistent with tolling.'" *Id.* at 31.

6. This Court disagrees with *Oropallo*'s interpretation of section 6511, and therefore finds this section distinguishable from the limitations period in *Lampf*. Because the Supreme Court's principal rationale for not applying equitable tolling in *Lampf* was the cutoff provision of section 78i(e), this Court focuses on *Oropallo*'s analysis of section 6511(b)(2)(A) as a cutoff which is inconsistent with equitable tolling. This Court disagrees with *Oropallo*'s finding that section 6511(b)(2)(A)'s limit on the amount of money a taxpayer can recover is similar to section 78i(e)'s limit on bringing a case. The 3–year period in *Lampf* provides that no "*action* shall be maintained to enforce any liability created under this section, unless brought ... within three years after such violation." 15 U.S.C. 78i(e) (emphasis added). Thus, this period is a total bar to an action brought outside the required time. Section 6511(b)(2)(A) however is not a total bar, but a limit on the amount of recovery. Section 6511(b)(2)(A) provides that "the credit or refund shall not exceed the portion of the tax paid during the two years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(A). Unlike section 78i(e), section 6511(b)(2)(A) in no way prevents the bringing of a lawsuit, it simply limits the amount of money the taxpayer can recover. Thus, section 6511(b)(2)(A)'s period of repose is significantly different than section 78i(e)'s period of repose and is not inconsistent with equitable tolling.

7. In addition to finding section 6511 distinguishable from the limitations period in *Lampf*, this Court disagrees with *Oropallo* on another basis. *Oropallo* discussed section 6511(a), which requires a taxpayer to file a refund claim within three years of filing a return, or, if no return was filed, within two years from the date the tax was paid. In discussing section 6511(a), the *Oropallo* Court declared this section to be analogous to the 1–year period in section 78i(e), stating:

> In *Lampf*, the Supreme Court commented that the one-year period for filing suit after discovery of facts giving rise to the cause of action made tolling unnecessary. What the Court obviously meant was that once someone who has been defrauded knows the relevant facts, the 1–year period gives that person ample time in which to sue and there is no need to toll the 1–year

limitations period. A similar state of knowledge respecting the right to a refund can be attributed to individual calendar year taxpayers who file income tax returns. The return contains all the information necessary to verify that there has been an overpayment of taxes and that a refund is due. Accordingly, the three-year period in section 6511(a) gives the taxpayer ample time to file a refund claim, and there is no need to toll that period.

*Oropallo*, 994 F.2d at 30 (citations omitted). This Court disagrees with *Oropallo*'s analysis of section 6511(a). If a taxpayer is mentally incompetent, that taxpayer will not necessarily be able to evaluate a tax return to determine whether a right to an overpayment exists. Moreover, in this case no tax return was prepared until 1989 due to Scott's incompetency. Furthermore, the tax return will not always have all the information necessary to verify that there has been an overpayment. Taxpayers must often examine documents collateral to the tax return to determine whether there has been an overpayment. Consequently, this Court finds that section 6511(a) is not analogous to *Lampf*'s 1–year limitations period in section 78i(e).

8. Because this Court disagrees with *Oropallo*'s interpretation of sections 6511 and finds the section distinguishable from the limitations period considered in *Lampf*, this Court declines to follow *Oropallo* and adheres to its earlier decision in *Scott I*, which held that section 6511 may be equitably tolled by mental incompetence under the proper circumstances. The Court discusses the rationale of the *Scott I* holding in more detail below.

9. In *Irwin v. Veterans Administration,* the United States Supreme Court stated:

Once Congress has made such a waiver [of sovereign immunity to allow suits by citizens against the government], we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver.

498 U.S. at 95, 111 S.Ct. at 457. The Supreme Court then held "that the same rebut-table presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Id.* The Ninth Circuit has noted the rebuttable presumption established in *Irwin* in *Seattle Audubon Society v. Robertson,* 931 F.2d 590, 595 (9th Cir.1991): "The [*Irwin*] Court held that whenever Congress waives the government's sovereign immunity and permits suit against the government, there is a rebuttable presumption that the doctrine of equitable tolling applies." In the case at bar, the United States has presented insufficient evidence to rebut the presumption that equitable tolling applies against it in tax refund cases.

10. Further, while *Irwin* did not directly hold that mental incompetency constitutes a ground for equitable tolling, *Irwin* supports such a holding. The *Irwin* Court noted that "[f]ederal courts typically have extended equitable relief only sparingly," and then offered two examples of situations where equitable tolling applies: where the claimant has actively pursued his judicial remedies but has filed a defective pleading, and where claimant has been induced or tricked by his adversary into allowing the filing deadline to pass. *Irwin,* 498 U.S. at 94–96, 111 S.Ct. at 457–58. The Supreme Court, however, did not intend these examples to be an exhaustive listing of the situations where equitable tolling applies. The Supreme Court used very broad language when discussing the extent to which equitable tolling applies to the United States, holding that the *same rebuttable presumption* of equitable tolling which applies to suits against private parties applies to suits against the United States. Thus, under *Irwin,* mental incompetency tolls suits against the government to the same extent that it tolls suits against private parties. Furthermore, the *Irwin* Court's use of the language, "federal courts ... have extended" supports a finding that *Irwin* did not intend its examples to be an exhaustive listing. "Federal courts" includes the lower federal courts as well as the Supreme Court, and therefore lower federal court decisions, as well as Supreme Court decisions, should be examined to determine under what circumstances equitable tolling applies. As discussed below,

lower federal courts have ruled that mental incompetency constitutes a ground for equitable tolling, and therefore, under *Irwin,* mental incompetency may toll a federal statute of limitations.

11. The Ninth Circuit has not addressed whether a federal statute of limitations may be equitably tolled by mental incompetence. Indeed, in *Atkins v. Union Pacific Railroad Co.,* 685 F.2d 1146 (9th Cir.1982), the Ninth Circuit explicitly left open the question of whether a plaintiff's mental incompetency could toll the statute of limitations on the Federal Employers' Liability Act. After finding that the plaintiff had not established facts sufficient to support a finding that he was mentally incompetent, the Court stated:

> Because we find no issue of fact, we need not decide whether the plaintiff's incompetency will ever toll the FELA statute of limitations. *But see, Brooks v. Southern Pacific Co.,* 105 Ariz. 442, 445, 466 P.2d 736, 739 (1970) (holding that FELA statute of limitations is tolled by incompetence).

*Id.* at 1148 (citation in original).

12. The cases from other jurisdictions are divided on the issue of whether mental incompetency will toll the statute of limitations. One line of cases hold that mental incompetency may not toll federal statute of limitations. *E.g., Harris v. Ford Motor Co.,* 635 F.Supp. 1472, 1473–74 (E.D.Mo.1986) (and cases cited therein) (mental incompetency does not toll six month statute of limitations for filing a hybrid § 301 LMRA/fair representation claim). Most of the decisions relied upon in *Harris,* however, involved claims against the federal government and therefore are called into question by *Irwin.*

13. Another line of cases finds that mental incompetency will toll federal statutes of limitations. *E.g., Nunnally v. MacCausland,* 996 F.2d 1, 4–5 (1st Cir.1993) (mental illness may toll 30–day filing period set in Civil Service Reform Act, 5 U.S.C. § 7703); *Lopez v. Citibank, N.A.,* 808 F.2d 905, 906–07 (1st Cir.1987) (mental incompetency may toll Ti-

tle VII statute of limitations); *Wiltgen v. United States,* 813 F.Supp. 1387, 1395 (N.D.Iowa 1992) (mental incompetence may toll statute of limitations in tax refund actions); *Johnsen v. United States,* 758 F.Supp. 834, 835–36 (E.D.N.Y.1991) (same); *Llewellyn v. Celanese Corp.,* 693 F.Supp. 369, 379 (W.D.N.C.1988) (mental incompetency may toll Title VII statute of limitations); *Moody v. Bayliner Corp.,* 664 F.Supp. 232, 235 (E.D.N.C.1987) (same).

14. In *Lopez,* decided before the *Irwin* decision, the First Circuit held that while there in no absolute rule of equitable tolling on the grounds of mental incompetency in Title VII cases, federal courts may toll the applicable statute of limitations on a case-by-case basis. The First Circuit initially acknowledged the line of cases finding against such tolling. *Lopez,* 808 F.2d at 906. It distinguished these cases on the basis that most involved suits against the United States and concerned "considerations of sovereign immunity."[1] *Id.* at 906–07. It then found that "an even longer line of common law authority finds, in insanity, a ground for tolling a limitations period." *Id.* at 907 (citing *Developments in the Law–Statutes of Limitations,* 63 Harv.L.Rev. 1177, 1229 (195)). Consequently, the *Lopez* Court found that mental incompetency could equitably toll the statute of limitations. The First Circuit has recently affirmed its position in *Lopez* in a post-*Irwin* decision, *Nunnally v. MacCausland,* 996 F.2d at 4–5.

15. In *Char v. Matson Terminals, Inc.,* 817 F.Supp. 850, 854–55 (D.Haw.1992), this Court adopted the reasoning of the *Lopez* line of cases. In accord with *Char,* this Court once again adopts the reasoning of the *Lopez* line of cases, especially in light of the fact that the cases cited in *Lopez* for the position that mental incompetency will not toll federal statutes of limitations have been called into question by *Irwin.* Hence, this Court holds that, pursuant to *Irwin v. Veterans Administration,* mental incompetency may toll the statute of limitations in tax

---

1. These cases have been called into question by *Irwin.*

refund cases when the appropriate circumstances are present. This holding is supported by fundamental principles of equity. Fundamental principles of equity mandate that when a person suffers from a disease rendering him mentally incompetent to assert his rights during the period he was incapacitated, time limitations should not operate to preclude him from seeking redress for his injuries.

■ 16. In *Scott I*, this Court declined to determine whether alcoholism created the sort of mental incompetency necessary for equitable tolling. Based on the expert testimony in this case, this Court now finds that the disease of alcoholism can create the sort of mental incompetency necessary for equitable tolling.[2] The issue of whether a particular taxpayer suffers from severe enough alcoholism to cause mental incompetency should be analyzed on a case-by-case basis. *See Lopez*, 808 F.2d at 907 (equitable tolling for mental incompetence is analyzed on a case-by-case basis). The experts in this case have testified that Scott's alcoholism was sufficiently severe to cause him to be mentally incompetent. Based on this expert testimony and other evidence adduced, this Court has found that Scott's alcoholism caused him to be mentally incompetent and incapable of filing a tax return from at least January 1985 through early November 1989.

17. The United States argues that this Court should not apply equitable tolling in cases where alcoholism has caused mental incompetency on policy grounds that alcoholism results in staggering costs on society and the Court should only apply equitable principles when it is in society's best interest, as equity is " 'to live honestly, to harm nobody, to render every man his due.' " United States' Trial Brief, at 16 (quoting Justinian's Inst. lib. 1, tit. 1, § 3). The experts in this case have testified that alcoholism is a disease and not a wrongful or reprehensible act, and therefore equitable principles may be applied to cases where alcoholism causes mental incompetency.

■ 18. In alternative to the *Irwin* principles discussed above, this Court holds that the impossibility doctrine discussed in *Seattle Audubon* and *Forti v. Suarez–Mason* apply to toll the statute of limitations in the case at bar. *Seattle Audubon*, 931 F.2d 590; *Forti*, 672 F.Supp. 1531 (N.D.Cal.1987). As stated in *Seattle Audubon*, when "extraordinary circumstances beyond plaintiffs' control make it impossible to file the claims on time," equitable tolling applies. 931 F.2d at 595; *Forti v. Suarez–Mason*, 672 F.Supp. at 1550 (N.D.Cal.1987) ("Where extraordinary events which are beyond plaintiff's control prevent a plaintiff from bringing his claim, the limitations period is tolled until the barrier caused

**2.** The Court notes that its holding that alcoholism may create the type of mental incompetency to toll the statute of limitations is supported by Hawaii state law. Haw.Rev.Stat. § 657–13 provides that a state statute of limitations is tolled when a person is insane at the time the cause of action has accrued. In *Christian v. Waialua Agric. Co.*, 31 Haw. 817, *appeal dismissed*, 52 F.2d 847 (9th Cir.1931), *questioned on other grounds, Sandstrom v. Larsen*, 59 Haw. 491, 495, 583 P.2d 971, 975 (1978) (questioning *Christian's* finding that the Hawaii Supreme Court could independently review evidence and make its own findings), the Hawaii Supreme Court stated:

In 32 C.J. 594 (§ 4), the author of the text says: " 'Insanity' is a broad, comprehensive, and generic term, of ambiguous import, for all unsound and deranged conditions of the mind.... And it ordinarily implies every degree of unsoundness of the mind, whether it is casual, temporary, or permanent, [and] whether of a mild or violent form; and it includes

not only that derangement of the mind produced by disease of the brain, such as is recognized by law as a defense to crime, which is the sole product of it, *but it may also embrace conditions of subverted reason, such as may be produced by intoxication*. The word has been frequently used to designate all mental impairments and deficiencies formerly embraced in terms 'idiocy,' 'lunacy,' and 'unsoundness of mind.' "

*Christian*, 31 Haw. at 902 (emphasis added). Under the definition in *Christian*, alcoholism would constitute insanity or mental incompetence which would allow for equitable tolling.

The Court also notes that the United States Supreme Court case of *Kendall v. Ewert*, 259 U.S. 139, 42 S.Ct. 444, 66 L.Ed. 862 (1922), supports its holding that alcoholism may create the type of mental incompetency to toll the statute of limitations. In *Kendall*, the Supreme Court recognized that habitual drunkards are not competent to transact business, even if they have their sober moments. *Id.* at 146, 42 S.Ct. at 447.

by these events is removed."). Both experts have testified that Scott's alcoholism, a disease, caused Scott to be mentally incapable of filing his tax return. Thus, this Court holds that Scott's alcoholism constitutes extraordinary circumstances beyond Scott's control [3] which made it impossible for him to file his tax return, and therefore, under *Seattle Audubon* and *Forti*, the limitations period in section 6511(a) was tolled during Scott's mental incompetency. The Court notes that the United States has not shown that it has been unjustly prejudiced by the tolling of the statute of limitations. *See Seattle Audubon*, 931 F.2d at 597.

19. Given the above, Scott's refund action is not time-barred and he is entitled to a refund of his overpayment of $30,096.00 for the 1984 taxable year. Scott is also entitled to interest on the overpayment. Under 26 U.S.C. § 6611, Scott is entitled to interest from the date he filed his return. The Court declines Scott's invitation to use its equitable powers to allow Scott interest from the date of the overpayment. Hence, pursuant to the parties' stipulation, interest on the $30,096.00 from November 28, 1989 to October 5, 1993 brings the total to $41,327.00. The Court also holds that the interest owed to Scott continues to accrue from October 6, 1993.

20. There being no just reason for delay, the Court hereby directs entry of final judgment in favor of Scott as specified above.

IT IS SO ORDERED.

---

3. In ruling that Scott's alcoholism constitutes extraordinary circumstances beyond his control, this Court relies heavily upon the expert testimony opining that alcoholism is a disease.